### The LEXINGTON.

(Circuit Court of Appeals, Second Circuit. July 15, 1921.)

No. 239.

1. **Collision** ⊙⟶37—**Tug in fault for collision between tow and crossing steamer.**

A tug with barges in tow alongside *held* solely in fault for a collision between her tow and a crossing steamer approaching from starboard for violation of the starboard hand rule, which made her the burdened vessel and required her to keep out of the way and to avoid crossing ahead, instead of which she kept her course and speed on the assumption that the steamer would follow her usual course and turn to port before the vessels met.

2. **Collision** ⊙⟶90—**Narragansett Bay not "narrow channel."**

Narragansett Bay, which is customarily navigated in all directions, is not a narrow channel, and the starboard hand rule applies to navigation therein.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series. Narrow Channel.]

⊙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Collision ☞144—Contributory fault must be clearly shown.**
Where the fault of one vessel for a collision is established beyond question, she is not entitled to a division of damages with the other except on clear proof of a fault not made in extremis.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Elmer A. Keeler against the steamer Lexington; the Colonial Navigation Company, claimant. Decree for respondent, and libelant appeals. Affirmed.

Park & Mattison, of New York City (Samuel Park, of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Frederick Pennell, both of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. [1] This is a suit in admiralty to recover damages for a collision which occurred on January 21, 1919, at about 3:45 a. m. in Narrangansett Bay. The suit seeks to recover damages for injuries which were sustained by the barges Kathryn A. Keeler, the Lusitania, and the Penn, while in tow of the tug Elmer A. Keeler. The court below dismissed the libel and held the Keeler solely at fault for the collision.

The Lexington is a single screw steel freight and passenger steamer 246 feet long with 46 feet beam. At the time of the collision she was proceeding on her regular trip from New York to Providence, and was in charge of a licensed pilot. A quartermaster was at the wheel and a lookout was stationed on the bow. All lights were set and burning.

The tug Elmer A. Keeler was in charge of her pilot. She was bound from Providence to Newport, and had in tow the barges Kathryn A. Keeler and the Lusitania on her starboard side, and the Penn and William S. Keeler on her port side. These barges were light coal boats. The tug had her lights burning. The Keeler had passed Rose Island and was headed for Lime Rock Light, intending to go around the southerly end of Goat Island to Newport, and she was on the easterly side of the channel when passing Rose Island. As the Lexington was passing the Dumplings, on a course from Castle Point N. E. by E. ½ E. heading for Newport Light, she observed the green light and towing lights of the tug Keeler bearing three or four points on the port bow. The regular course of the Lexington after reaching the Dumplings on her way to Providence was N. ½ E., and the pilot in charge of the Keeler expected the Lexington, when the Dumplings were abeam, to pursue her regular course up the channel. The navigator of the Lexington, when a short distance below the Dumplings, saw the green light of the Keeler close to Rose Island, and observed by the lights that she had a tow alongside. The distance between the Lexington and the Keeler at this time has been estimated at between

one-half and three-quarters of a mile by the pilot of the Lexington, and by the pilot of the Keeler a little more than a mile. The Keeler kept on her course toward Lime Rock Light, all the while expecting the Lexington to starboard her wheel when off the Dumplings and proceed on her regular course to Providence up the channel by Rose Island. The chart shows that from the Dumplings to Providence the channel is buoyed. The Lexington, after passing the Dumplings, still exhibited her red light to the Keeler instead of her green light. The Keeler gave a signal of two whistles, which was immediately answered by the Lexington by a similar signal. The distance between the two vessels at the time this signal of two whistles was given was about one-half mile. The green light of the Lexington was not observed by those of the Keeler except at the time of the collision. The Lexington was showing her red light only. The vessels were on crossing courses. The Keeler had the Lexington on her own starboard hand. The Lexington kept her course and speed. The Keeler blew no signals, but continued to show her green light only—of her side lights. No other vessels were in the vicinity to interfere with navigation, and there was plenty of room for the Keeler to have passed under the Lexington's stern. Suddenly the Keeler blew two blasts, indicating that she would attempt to cross the Lexington's bow. The Lexington immediately answered with two blasts, put her engines full speed astern, and blew three blasts, indicating that her engines were backing full speed. She succeeded in getting her way nearly off, but her stern struck the starboard side of the Lusitania, the Keeler's starboard outside barge, causing serious damage. The Lexington sustained no damage.

Article 19 of the rules provides that—

"When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

It is conceded that the Keeler and the Lexington were on crossing courses. It is also conceded that the Keeler had the Lexington on her own starboard hand. Under article 19 the Keeler was bound to keep out of the Lexington's way. Therefore, under article 21, the Lexington was entitled to keep her course and speed. And this she did until the Keeler made the attempt to cross the Lexington's bow. Then the Lexington, as already indicated, put her engines full speed astern and backed.

Until the Lexington reversed her engines upon receiving the two-blast signal from the Keeler, which was about two minutes before the collision, she was proceeding at her regular speed of 14 or 15 miles an hour and bucking an ebb tide. The Keeler was making 4 or 5 miles an hour. The engineer of the Keeler testified that his boat was proceeding at full speed. This is an excerpt from his testimony:

"Q. Do you remember when the collision occurred? A. Yes.
"Q. And the vessel did not change her speed at all? She continued at full speed? A. Yes; if I remember correctly, she continued at full speed."

In this, however, his testimony differed from that of the pilot of the Keeler. The pilot's testimony was as follows:

"Q. First let me ask you about how far away do you judge the Lexington was when you first saw her? A. A little more than a mile.

"Q. And about how long do you think it was from the time you first saw her until the collision? A. About three or four minutes.

"Q. About how long was it from the time you saw her until you blew your two? A. A couple of minutes.

"Q. That is, you were approaching her, showing your green, and she was approaching you showing the red, and you were on crossing courses for a couple of minutes before you blew her anything? A. Yes, sir.

"Q. And then you tried to cross her bow, from port to starboard, didn't you? A. Yes, sir.

"Q. What makes you think that you stopped and reversed your engines? A. To lessen the collision.

"Q. What? A. I thought that would be the best thing I could do to lessen the collision.

"Q. I thought you testified that you blew two in order to cross her bow. Why didn't you keep full speed ahead to cross her bow? A. When I saw she was so close that there was to be a collision, I stopped and backed.

"Q. After you blew the two, you decided you could not make it, and then you stopped and backed. Is that right? A. No, sir.

"Q. That is not right? A. No, sir.

"Q. Well, what is right? A. When I saw she was so close that she did not change her course, but come so close that there would be a collision, I stopped and backed.

"Q. She had already blown alarms then, hadn't she? A. Yes, sir.

"Q. And that is why you stopped and backed? A. Yes, sir.

"Q. You did not appreciate that you could not make it until after she blew alarms? A. Just shortly after she blew alarms, when I saw she came so close.

"Q. Those alarms followed pretty quickly after the two blasts, didn't they? A. A short time after; yes, sir."

The pilot stated, what undoubtedly was the fact, that if he had not known that the boat was the Lexington, and had not expected her to pursue a course she was accustomed to take up the channel, and to do so would starboard her wheel, he would not have done what he did do, but would have passed under the Lexington's stern. This is an excerpt from his testimony:

"The Court: Let me ask you: Now, if you had regarded the course of the vessels, your vessel and the Lexington and the lights only, what did you think your duty was? Get out of your mind that you supposed that the Lexington would make the turn and go up straight. Suppose it was not the Lexington, but suppose it was some other vessel. What would you regard it your duty to do?

"Witness: I would have gone under his stern.

"The Court: You would port your helm and go under her stern?

"Witness: Yes, sir.

"The Court: If it was any other vessel—a vessel you didn't know?

"Witness: Yes, your honor.

"The Court: You did not do that on this occasion, did you?

"Witness: No, sir.

"The Court: And I suppose the reason was that you had it in your mind that ordinarily the Lexington went up, turned the Dumplings, or near there, and then went on straight?

"Witness: Yes, your honor."

The District Judge in dismissing the libel stated his opinion of this assumption as follows:

"I got the impression from his testimony that what was bothering him was his conception that the Lexington would take the course which from his

point of view she usually took. He had no right to assume that, because otherwise you would substitute for very necessary orderly rules of the road the guess of the master of one vessel as to what was in the mind of the navigator or the master of the other, and that would be a very unsafe guide. The particularity with which in this circuit the obligations of the starboard hand rule have been stressed, it seems to me, is due to the fact that when a situation becomes at all troublesome, the navigation is much safer if a definite rule is adhered to, except perhaps in the circumstances which must be considered in some cases of some very extraordinary situation where the exercise of prudent judgment might dictate something else. But I am rather convinced that it is an important requirement that the rule be very strictly obeyed."

[2] It is argued on behalf of libelant that the pilot of the Keeler was justified in assuming that the Lexington would pursue her regular and customary course. The argument addressed to us was that after the Lexington left the outside waters and reached the Dumplings she was then in the waters governed by the narrow channel rule, and in that situation exhibition of one side light or the other does not necessarily invoke the application of the rules based on the exhibition of lights. While approaching the Dumplings from Castle Hill the Lexington was exhibiting her red light, and after reaching the Dumplings, in order to proceed to Providence, she would have to starboard her wheel, and if she was upon her regular course she would have exhibited to any vessel in the location of the Keeler her green light. Pursuing the course N. E. by ½ E. past the Dumplings would soon inevitably bring the Lexington upon Goat Island. She must change her course after passing the Dumplings or become a wreck, and the pilot of the Keeler was justified in applying ordinary intelligence as to what the Lexington was expected to do.

And our attention is called to the case of The Arrow, 214 Fed. 743, 131 C. C. A. 49, decided by this court, and in which we said:

"We do not think that the navigation of the vessels when encountering each other at Horn's Hook was to be controlled by the starboard hand rule for vessels on crossing courses, although at some time their respective headings were such that their courses if prolonged would cross. The Supreme Court, in The Victory and The Plymothian. 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519, held that the starboard hand rule is ordinarily inapplicable to vessels coming around bends in channels, which may at times bring one vessel on the starboard of the other; that vessels must be known to follow the courses of the river bank; that, although vessels navigating in a river may sometimes be on crossing courses under the rule, that depends on their presumable courses; that the question always turns on the reasonable inference to be drawn as to a vessel's future course from her position at a particular moment, and this greatly depends on the nature of the locality where she is at that moment. We are not satisfied that it is safe and proper presumption that a vessel bound down the Harlem River which has reached the bight above Horn's Hook, keeping along the New York shore on her way down, is going to take the easterly rather than the westerly channel to pass Blackwell's Island. Either course is open to her. A vessel coming up the river in that locality is 'meeting' a vessel coming down, and, if she wishes to navigate on the theory that the vessel she is meeting is going to cross over at that point, she should ascertain if that be the intention by exchange of signals. Until such intention be thus developed the safe course for both vessels is to follow the 'meeting' rule."

The doctrine of the above case contemplates navigation in coming around bends in channels. It was based on The Victory and The

Plymothian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519, and this court declared in The Mohawk, 242 Fed. 845, 850, 155 C. C. A. 443, it contemplates "a short bend or curve, where for some reason approaching vessels cannot see each other within half a mile." The situation referred to in these cases is not the situation which exists in the case now under consideration. The pilot of the Keeler stated that he saw the Lexington "a little more than a mile away," and the vessels were approaching each other in full view for two minutes before the Keeler blew two blasts.

Those in charge of the Keeler knew that under the rules the Lexington was the privileged vessel entitled to keep her course and speed. But they chose to speculate upon what they thought the Lexington would do, and so the burdened vessel kept right on, and, when she discovered her mistake, undertook to cross the Lexington's bow. In doing so she took the risk of the venture.

The narrow channel rule of article 25 has no application. The waters in which these vessels were navigating did not constitute a narrow channel within the meaning of that article. It was pointed out in The No. 4, 161 Fed. 850, 88 C. C. A. 668, that "channels within the rule are bodies of water navigated up and down in opposite directions." And, as indicated in The Hokendauqua, 270 Fed. 270, which this court affirmed in a decision at the present term (270 Fed. 273), harbor waters where the necessities of commerce require navigation in every conceivable direction "up and down and across" are not to be considered narrow channels.

Article 22 provides that—

"Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

It was the duty of the Keeler to keep out of the way of the Lexington, and there was nothing in the circumstances which prevented her from doing so. But she did not do so and undertook to cross ahead of her. The collision was the result. The fault was that of the Keeler.

The Keeler also violated article 23, which provides that every steam vessel which is bound to keep out of the way of another "shall, on approaching her, if necessary, slacken her speed or stop or reverse." But, as before stated, the pilot of the Keeler testified that his boat continued at full speed.

[3] We are unable to see that the Lexington was in fault. Certainly if the Lexington was in fault at all, the error was committed in extremis and was superinduced by the prior error of the Keeler. The fault of the Keeler being established beyond any peradventure, she is not entitled to divide damages with the Lexington except upon clear proof of a fault not made in extremis. The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84; Lake Erie Transportation Co. v. Gilchrist Transportation Co., 142 Fed. 89, 73 C. C. A. 313.

Decree affirmed.