## THE SUEDCO. THE JENNIE R. MORSE. SUBMARINE BOAT CORPORATION v. UNITED STATES.

(District Court, D. Connecticut. September 15, 1922.)

No. 2367.

1. **Collision** ⟜71(2)—**Moving vessel in fault for collision with anchored vessel.**

   A collision on anchorage grounds in New York Harbor, when the steamship Morse, on leaving her anchorage, went full speed astern until she struck the steamship Suedco, anchored 1,000 feet away, *held* due solely to the fault of the Morse, in that, when she started astern, owing to the wind and tide, her stern swung to starboard, instead of to port, as her captain expected, but, instead of reversing or dropping anchors, he continued at full speed without warning, in the hope of avoiding the Suedco, though he realized that he was taking a "chance."

2. **Collision** ⟜71(3)—**Error in extremis not contributory fault.**

   Failure of officers of an anchored vessel, lying without steam up, to pay out anchor chain when another vessel was moving astern toward her, *held* not a fault contributing to their collision, where the danger of collision was not apparent until the moving vessel was within 200 feet and within one minute of collision, and when, even if an error, it was in extremis.

3. **Collision** ⟜123—**Contributory fault must be clearly established.**

   Where one vessel is clearly chargeable with fault sufficient to account for a collision, she has the burden of proving contributory fault of the other vessel with equal clearness.

4. **Collision** ⟜73—**Moving vessel presumed in fault for collision with anchored vessel.**

   When a vessel under steam runs down a ship at anchor, in broad daylight, that fact is by itself prima facie evidence of fault, and the vessel under way cannot escape liability, except by proving that a competent seaman could not have avoided the collision by the exercise of ordinary care.

In Admiralty. Suit for collision by the Submarine Boat Corporation, owner of the steamship Suedco, against the United States, owner of the steamship Jennie R. Morse, with cross-libel. Decree for libelant, and exceptions to answer and cross-libel sustained.

Bigham, Englar & Jones and James W. Ryan, all of New York City, for libelant.

H. T. Atkins, of New York City, and Allan K. Smith, Asst. U. S. Atty., of Hartford, Conn., for the United States.

THOMAS, District Judge. This is a libel filed in accordance with the provisions of the Suits in Admiralty against the United States Act of March 9, 1920 (41 Stat. 525), by the Submarine Boat Corporation, as owner of the steamship Suedco, against the United States of America, as owner of the steamship Jennie R. Morse, to recover damages suffered by the Suedco while at anchor in the temporary general anchorage grounds off Stapleton, Staten Island, in New York Harbor, about 5:05 o'clock in the afternoon of September 14, 1920, as a result of the Morse colliding with the Suedco while the Morse was backing full speed with the tide and wind in an attempt to turn around and, after picking up a pilot, to proceed to sea. The allegations of negligence on the part of the Morse are contained in the fourth paragraph of the libel, wherein it is set forth:

"The aforesaid collision and consequent damage were not caused nor contributed to by any fault nor neglect on the part of the Suedco, but were due to the neglect of those in charge of the steamship Jennie R. Morse, in the following, among other, particulars, which will be pointed out at the trial of this action: (1) In that, while the Suedco was at anchor on a lawful anchorage ground, she was run into by the Jennie R. Morse. (2) In that the steamship Jennie R. Morse failed to keep a proper and vigilant lookout. (3) In that those in charge of the Jennie R. Morse were incompetent and inattentive to their duties."

The Suedco alleges that her damages were $20,000.

To the libel the respondent filed an answer, in which it admitted the jurisdiction of this court, but denied the allegations of negligence as contained in paragraph 4 of the libel, and at the same time filed a cross-bill, wherein it alleged, among other things, and particularly in paragraphs 8 and 9, that the steamship—

"Jennie R. Morse, being at anchor on lawful anchorage ground off Tompkinsville, Staten Island, proceeded to weigh anchor, preparatory to prosecuting her voyage to Baltimore, Md. The tide was ebb and the wind northeast, force about three or four on the Beaufort Scale. The anchorage was congested; a revenue cutter being anchored a short distance ahead to starboard, and other vessels ahead to port. The Suedco lay at anchor abaft the starboard quarter of the Jennie R. Morse. In order to pass the revenue cutter safely on the port hand of the Jennie R. Morse, the latter's engines were put astern in anticipation of the Jennie R. Morse's stern swinging to port and her bows to starboard. However, the stern of the Jennie R. Morse swung to starboard, instead of to port, and toward and across the bows of the Suedco. In this position the wind and the tide caught the vessel, causing her to be carried down slowly toward the bows of the Suedco. The only chance of safety lay in continuing the engines of the Jennie R. Morse at full speed astern. In making this maneuver, although every precaution was taken by the Jennie R. Morse, the wind and the tide continued to carry the vessel down on the bows of the Suedco. The said collision was brought about or contributed to by those aboard the Suedco in failing to keep a proper anchor watch, and, as the vessel approached, to veer the Suedco's chain, which would have avoided collision, with the result that the vessels came together, the port side of the Jennie R. Morse just abaft the break in the forecastle head striking the stem of the Suedco, causing considerable damage to the Jennie R. Morse. That the collision and subsequent damages were not caused through any fault of respondent, or those in charge of the navigation of the Jennie R. Morse, but was due to the faults of the said Steamship Suedco, or those in charge of her, in the following respects: (1) In that she failed to maintain a proper anchor watch. (2) In that she failed to take proper and seasonable measures to avoid collision. (3) In that she failed to veer her anchor chain, which would have avoided collision. (4) In other respects to be shown at the trial.

The Morse also alleges that her damages were $20,000.

To the answer and cross-libel of the Morse the Suedco filed an "Answer to Cross-libel," wherein it denies the allegations of negligence charged against her, and the allegations of negligence against the Morse were practically reiterated, as originally set forth in the libel. In addition the Suedco filed "Exceptions to Answer and Cross-Libel" upon three grounds:       •

"(I) That said answer does not set forth facts sufficient to constitute a defense to the libel herein. (II) That said cross-libel does not set forth facts sufficient to constitute a cause of action. (III) That said answer and/or cross-libel do not set forth facts sufficient to show negligence or contributing fault on the part of the Suedco or of those in charge of her."

The case then proceeded to trial on the pleading and proofs, and the evidence was exceptionally brief, in view of the importance of the case, because of the substantial damage suffered by both ships. The testimony presented came from four witnesses, the second and third mates on the Suedco and the master and second officer on the Morse. The second mate on the Suedco was not in court, so his testimony was taken by deposition de bene esse. The other three witnesses testified at the trial. In many respects all witnesses are agreed upon many of the incidents prior to the attempt of the Morse to put to sea—her maneuvers in attempting to get out of the anchorage ground, and the details of the collision, together with the distances other vessels in the same anchorage grounds were from the various ships at anchor. It is to be expected, and it is true, that in some respects they differ upon some facts; but the evidence is satisfactory, and such as a finding can well be made of the whole transaction, in order to determine which ship was at fault in causing the collision. In fact, the testimony was so free from contradictions that, after counsel for the libelant had filed his brief, which contained a statement of facts as claimed by him, counsel for respondent, to quote his brief, said:

"We are content to adopt the statement of the case which appears in the brief of the Suedco," except as to five points, to wit: "(1) The tide—claiming that it was from 2 to 2½ knots, and not from 2 to 4 knots. (2) The wind—claiming it was from the north, or, at most, north by east and not northeast. (3) That the Morse was at no time broadside to the wind. (4) That the master of the Morse realized, when his vessel unexpectedly swung her stern to starboard 'against her wheel,' that 'it was going to be a close call' to cross the bows of the Suedco, but therein lay the only chance of avoiding collision. (5) That, notwithstanding the testimony of Sebert, third mate of the Suedco, the Suedco did not pay out any anchor chain."

As between the claims of fact made by counsel for the respective parties, it seems clear, on the evidence, that the following is an accurate narrative of events, and in this narrative the five points made by counsel for the respondent will be discussed and decided, with most of which I agree.

[1] About 5 o'clock on the afternoon of September 14, 1920, the steamships Suedco and Jennie R. Morse were at anchor, heading to the ebb tide, in the temporary general anchorage grounds off Stapleton, Staten Island, New York Harbor. The tide was ebbing from north to south, force from 2 to 2½ knots per hour. The atmosphere was clear,

and the sun was shining. The wind was from the north or north by east, velocity about 17 miles per hour. The Suedco was light, and was anchored between 1,800 and 2,000 feet from the shoal water line off Stapleton, or about 350 or 400 yards southwest of the white buoy marking the southeast corner of man-of-war anchorage. The Morse was also light, and was anchored about 1,000 feet from the Suedco, bearing about two points (22.5°) on her port bow. Thus by trigonometry it appears that the Morse was 382.7 feet to the left of the Suedco. A schooner was anchored about two ships' lengths (about 805.2 feet) on the port beam of the Suedco. A revenue cutter was anchored on the starboard bow of the Morse, distant either one ship's length (402 feet), with a foul berth, or half a ship's length, 3 points (33¾°) forward of her beam. A tug and three barges had been maneuvering from about 4:30 to 5 o'clock about two ships' lengths ahead of and on the starboard bow of the Morse. The main ship channel was about 400 yards on the starboard beam of the Suedco. Another ship channel extended parallel with the shore on the port beam of the Suedco, between the schooner and the shoal water line.

The Morse is a steel single screw cargo vessel, with a registered tonnage of 6,061 tons gross, 5,559 tons under deck, and 3,758 tons net; her length is 402.6 feet, breadth 53.2 feet, and depth 32 feet, with a speed full ahead of 9 or 10 knots, and full astern of 5 or 6 knots. The Suedco is a steel cargo vessel with a registered tonnage of 3,545 tons gross, 3,005 tons under deck, and 2,174 tons net. Her length is 324 feet, breadth 46.3 feet, and depth 25 feet. The anchorage ground on which the Suedco had come to anchor on the previous day was used, for not exceeding 72 hours, by vessels entering or leaving port while awaiting berth or sailing orders. Both the Suedco and the Morse had been brought to anchor by pilots.

About 4 o'clock on the afternoon of the collision, the captain of the Morse came aboard with sailing orders from his owner's agents. Arrangements were made for a pilot to move the vessel to sea, but, when the pilot arrived in the main ship channel near the Morse, the captain of the Morse, without waiting for the pilot to come aboard, because, as he testified, "I preferred to stream my own ship," completed weighing his starboard anchor, which brought his vessel half a ship's length ahead of her original position, and apparently with the wind and tide slightly on her starboard bow, as a result of having picked up anchor on the starboard side, backed full speed with wind and tide, "expecting" the Morse's stern to swing to port because of the pitch of the screw, although the record does not show that she had a right-handed screw. The captain had planned, after the stern of the Morse had swung to port and when his ship was pointing northeast, to go full speed ahead with a port helm and turn to starboard across the bows of the Suedco, and, after picking up the pilot, stand out to sea. But his calculations of what would happen miscarried, and after the Morse had backed half a ship's length, thus bringing her to her original position in the water while anchored, "the tide and wind getting her on a little angle and getting hold of her high bow, that being high in the water," as the captain testified, swung her bow to port, and, acting with "numerous causes," caused her stern to swing to starboard, instead of to port. The captain of the

Morse testified that, even after the stern had swung to starboard, instead of to port, he did not then believe that there was any risk of collision, but expected, by continuing the backing full speed, to cross the bows of the Suedco safely, stern first, instead of bow first, as originally intended. Shortly afterwards, however, when the vessel arrived at M–6 on Government's Exhibit 2, a point 200 feet from the Suedco, he first believed that there was a risk of collision. Believing that it was then "too late to do anything," although he admitted that he should have blown a danger signal, without any whistle or other signal, except by motioning with his hand and shouting, he continued backing the Morse full speed until her port side, at a point about 60 feet abaft her stem, struck the stem of the Suedco, bending it to starboard and damaging the strakes on both the Suedco and the Morse.

According to the Suedco's evidence, the Morse was broadside at a right angle to the Suedco at the time of the collision. According to the third mate of the Morse, the fore and aft line of the Morse made a 25° angle with the fore and aft line of the Suedco at the time of the collision, and from all the facts and circumstances I conclude that the latter description is the more nearly correct. After the collision, the Morse continued backing along the starboard side of the Suedco until clear, and then put her engines ahead, with the port helm turned to starboard, and, picking up the pilot, proceeded to sea.

The captain of the Morse testified as follows:

"Q. That is when you finally came to the conclusion that it was going to hit the Suedco? A. Yes.

"By the Court: At that rate of traveling, how long did you travel from that point to the stem of the Suedco? A. I should say a minute.

"By the Court: And you were surprised to see this action of the ship going off to starboard? A. Yes, your honor. The thing took place in only a few minutes; quicker than you can tell it.

"By the Court: How long after you gave the order full speed astern up to the time of the collision? A. I should say two or three minutes.

"By the Court: You were 1,000 feet ahead, you say? A. Yes, sir.

"By the Court: The tide was how fast? A. At least two miles per hour; that is, 200 feet a minute, your honor, and the ship going obliquely.

"By the Court: When you got to about M–4, it commenced to occur to you that this Suedco was much in your way? A. When I was in this position, I figured to go full speed and go this way. I imagined I had room enough to go by.

"By the Court: How do you account for her swinging to starboard? How do you account for that? A. If it please your honor, there may be numerous causes for that. For instance, the tide and wind getting her on a little angle, and getting hold of her high bow, that being high in the water."

The captain of the Morse realized, when his vessel unexpectedly swung her stern to starboard "against her wheel," that "it was going to be a close call" to cross the bows of the Suedco, but therein, he believed, lay his only chance of avoiding collision. As to whether he considered it good seamanship to continue astern, he testified:

"Why, I considered the maneuver I carried out the best piece of seamanship that could be done, in order, if she got too close, to cause the least possible damage to the ship, giving her a sliding blow. The situation looked serious to me then, but I considered that in that way it was the only chance of clearing the vessel."

But it is to be noted that this statement has reference only to the time, or the moment, when the Morse was only 200 feet away from the bow of the Suedco, and that only one minute elapsed from that time until the moment of the collision. Then it was too late to do otherwise. It probably is true that, at that late moment, to have changed operations would have been worse than to have continued as he did. The fault occurred much earlier. Then it was too late either for the Morse to have done differently or for the Suedco to act to avert the collision.

The second mate of the Suedco was standing on the port side at the break of the shelter deck when he first noticed the Morse backing and apparently getting under way to stand out of the anchorage ground. He could see by the churning of her propeller and the motion of the ship that the Morse was moving her engines astern, and, believing that her engines would be put ahead, he thought that the Morse was under control. He did not realize that risk of collision existed until he noticed the Morse but a very short distance away from the Suedco, and apparently increasing her speed astern, instead of putting her engines ahead. Immediately on his realizing that there was risk of collision, he shouted to the chief mate that a ship was coming down on the Suedco, ran forward down the ladder to the well deck, and up the ladder to the forecastle head, but just as he reached the top of the ladder to the forecastle head the collision occurred.

The third mate of the Suedco was the officer having the day's duty, and who made the entries in the scrap deck logbook for that day. He was on the port side on the upper deck amidships, leaning on the rail, smoking and keeping a general lookout, when he noticed the Morse about 180 feet on the port bow of the Suedco rapidly approaching, almost broadside, as he said, with the engines going full speed astern. He testified that he shouted to the chief mate and second mate, and rushed forward to the forecastle head, and released the brake on the wildcat, so that the chain paid out, before the Morse struck the chain or the stem of the Suedco, about 10 or 12 fathoms. He then rushed to the pilot house and began turning the wheel to starboard, in an effort to sheer the stern of the Suedco to starboard; but, when he had turned the wheel about three-quarters of a turn, the Morse struck the Suedco. The chain then paid out, he said, about 15 fathoms. Great importance attaches to this question, as urged by the government; but whether the third mate was correct or incorrect in his testimony as to what he did is not vital, as will appear later when this question is discussed.

The smooth logbook of the Suedco, which was introduced in evidence, shows that efforts were made prior to the collision to sheer the Suedco, and that the wind, as estimated by the officers at the time and place of the collision, was northerly. The officer's record in this book, Libelant's Exhibit 2, is as follows:

"5:05 p. m. the American steamer Jennie R. Morse, while backing out from her anchorage, was caught by the strong tide (ebb) and northerly wind, and drifted down towards the bow of this ship. Attempts were made on the Suedco to sheer the ship over to port in order to avoid collision, but she was hit immediately by the Jennie R. Morse, with the result that the stem was twisted and four plates between the hawse pipes were badly bent. Jennie R. Morse also sustained some damage to her port side below the rigging on her forward deck."

283 F.—51

The government Weather Bureau report shows that the direction of the wind on the top of the Whitehall Building, in Manhattan, at 5 o'clock, was north, and that its velocity was 17 miles per hour.

The scrap logbook, the book of original entry of the watch officer of the Morse, was not produced. The smooth logbook merely recites the fact that, while leaving her anchorage, the Morse collided with the Suedco. No claim is therein made that the Suedco had an opportunity to do anything to avoid the collision or to get out of the way. The chief mate of the Morse, who was on the forecastle head, in charge of the ground tackle, was not produced as a witness, and no explanation was given as to his absence, or as to why the anchors were not let go when the Morse's stern unexpectedly swung to starboard. Neither was the second mate of the Morse produced, nor an explanation offered as to his absence.

It is conceded that this is not a case of inevitable accident. A careful examination of the evidence discloses that there is really only one question arising out of this controversy, and that is: Who was at fault, and where was the negligence, or what was the negligent act or acts, which brought about the collision? Counsel for respondent, in order to clear the issues, for which he is to be commended, is, as he says in his brief, "content to treat the case as one raising a presumption of fault on the part of the Morse," but insists vigorously that the proof shows that that presumption has been satisfactorily rebutted by the kind and quality of evidence which satisfies the rules of law.

[2] It is not disputed that the Suedco was properly anchored on a general anchorage ground, or that the collision was in broad daylight. The faults charged against the Suedco are: (1) That she failed to keep a proper anchor watch; and (2) that she failed to veer her anchor chain. In view of the evidence, I think these allegations come with poor grace from the Morse. Even her own captain had no thought of a collision until he was in the position of M–6 on Government's Exhibit 2, or a distance of 200 feet from the Suedco, or, in point of time, only one minute away from the actual collision. To expect the officers on the Suedco, at anchor, with no full head of steam up, to either pay out chain or in some way or other maneuver the Suedco so as to avoid the collision, which, as I believe and find, was brought about by the negligence of the master of the Morse, is to ask the next to impossible. Surely the men on the Suedco could not have anticipated the collision earlier than the captain of the Morse did, for they had a right to assume that, as the Morse was under way, her captain knew what he was doing, had her under control, and that he knew full well that the Suedco was riding at anchor, and that the burden was on him to maneuver so as to get out into the channel with safety; and whether the anchor chain on the Suedco was or was not paid out, or whether she was veered, or whether any attempt to veer her was made or not, is not vital, for the reason that the time elapsed of one minute was not sufficient for the men on the Suedco to do either of the things charged against them as constituting a fault, so that the court can say that her fault in any respect was the proximate cause of the collision.

It is to be noted that at no time was any danger signal given. The captain of the Morse claims that, because the revenue cutter and the tug

with its tow of barges was to the north of him and but a short distance away, he could not proceed ahead and reach the channel by passing to the stern of the revenue cutter and on his port bow, and thus swing to starboard and out into the channel. Manifestly that was the reasonable course, if the cutter and the tug had been far enough ahead to the north to allow him to make such a maneuver. Deciding that there was not room enough to do it, such decision must have advised him that, as long as he felt compelled to go full speed astern, the ships to his rear should at least be notified of his decision, that they might be ready to act, should occasion so require. But, as he testified, when he decided to go full speed astern, he expected the ship to answer the wheel and the engines, so as to throw the stern to port and the bow to starboard, and then he would have room to pass to the stern of the revenue cutter and pass it on his own port bow, and thus head out into the channel with engines full speed ahead.

But, instead of the stern being thrown to port, as her captain expected, it went to starboard, and at that moment, as I view the whole evidence, the captain was negligent. The instant he found his ship not responding as he had expected, and knowing, as he did, the proximity of all other ships at anchor, the conduct of a prudent seaman at that moment required him to stop as soon as possible, either by throwing out one or both anchors, or by reversing the engines to full speed ahead, or both, and hold her until he had time to make further calculations. It is perfectly apparent that, being light, with a high freeboard both fore and aft, as soon as the starboard anchor was up, the ship was caught by the wind and possibly the tide, and was veered around by both wind and tide, thus presenting so much surface to the wind as to overcome the action which the captain expected from the wheel and the engines. But, instead of doing this, instead of even sounding an alarm to warn the ships in the rear, he sticks persistently to full speed astern, all the while throwing the stern to starboard, and all the while giving the wind a broader sweep against the starboard side of the ship.

I am inclined to agree with the claim made by the captain, and urged by his counsel, that when he was at M–6, and only 200 feet or a minute away from the Suedco, there was nothing else for him to do but to persist in the course he was pursuing; for if he went ahead on his engines at that time, or threw out the anchor, or both of them, doubtless the tide would have carried him against the bow of the Suedco, and possibly, as he says, amidships, and that the only thing he could then do was to continue taking the "chance," as he said it was, in a hopeful endeavor to avoid striking. But at this point he claims that the officers of the Suedco were negligent, in that they did not pay out chain and let the Suedco drift back with the tide, so that in case he fouled the chain it would yield and thus avoid the impact. There are two sufficient answers to this claim. The first is made by the officer of the Suedco, who says he released the wildcat, thus relieving the tension on the chain, and that in consequence 15 fathoms ran out; and, second, that, if the officer of the Suedco did not pay out the chain, there was not time sufficient to do so from the moment the captain of the Morse hailed the officer on the Suedco to let go the anchor chain, which warning was given when the collision was only one minute away.

The failure of the captain of the Morse to stop his ship the moment he found she was not responding to the helm and was starboarding her stern rather than porting it, his failure to give the signal by means of the whistle, that he needed more room to the rear as soon as he determined to keep on the course the ship took herself with engines full speed astern, are the negligent acts which were the proximate cause of the accident. The facts show that the Morse was the burdened vessel, and that the captain miscalculated known factors, and, by not allowing a sufficient margin for safe navigation, he, and he alone, created the dangerous situation and risk of collision. It necessarily follows, as matter of law, that anything done by the Suedco, or anything that she failed to do, even if it can be said that it contributed to the collision, was not a fault, but an excusable error, in extremis.

[3] Upon this point, in the City of New York, 147 U. S. 72, at page 85, 13 Sup. Ct. 211, at page 216 (37 L. Ed. 84), Mr. Justice Brown said:

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of the other vessel should be resolved in its favor."

The Supreme Court in The Oregon, 158 U. S. 186, at pages 197 and 204, 15 Sup. Ct. 804, at pages 809 and 812 (39 L. Ed. 943), again stated the rule in the following manner, speaking by Mr. Justice Brown:

"As we had occasion to remark in the City of New York, 147 U. S. 72, 85, where one vessel clearly shown to have been guilty of a fault, adequate in itself to account for the collision, seeks to impugn the management of the other vessel, there is a presumption in favor of the latter, which can only be rebutted by clear proof of a contributing fault. This principle is peculiarly applicable to the case of a vessel at anchor, since there is not only a presumption in her favor, by the fact of her being at anchor, but a presumption of fault on the part of the other vessel, which shifts the burden of proof upon the latter. * * * As we have already observed, it is not sufficient for the Oregon to cast a doubt upon the management of the Clan Mackenzie. In view of the clearness of her own fault, it is not unreasonable to require that she should make the fault of the other equally clear. This she has fallen far short of doing."

See, also, The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620; The Lexington, 275 Fed. 279, 284 (C. C. A. Second Circuit); The Persian, 224 Fed. 441, 442, 443, 140 C. C. A. 135 (C. C. A. Second Circuit); The D. H. Miller, 76 Fed. 877, 879, 22 C. C. A. 597 (C. C. A. First Circuit); The Howard B. Peck (D. C.) 48 Fed. 334 (District of Connecticut); The Ceylon Maru (D. C.) 266 Fed. 396; The Lexington (C. C. A.) 275 Fed. 279; The Stifinder (C. C. A.) 275 Fed. 271. See, also, Grace Steamship Co. v. S. S. Gulf of Mexico, 281 Fed. 77 (decided by the C. C. A. Second Circuit, March 13, 1922).

[4] From an examination of the many cases upon this point, the rule is that, when a vessel under steam runs down a ship at anchor in broad daylight, that fact is by itself prima facie evidence of fault, and the vessel under way cannot escape liability for the consequences of her act, except by proving that a competent seaman could not have avoided

the collision by the exercise of ordinary care. The respondent here has failed to sustain the burden of proof the law casts upon it. In this case it was not enough, under the evidence, that the Morse should have avoided the collision, but she should have and could have earlier avoided the risk of collision. To have avoided the risk of collision was the obligation which was cast upon the captain of the Morse when he first began to maneuver. Then it could have been done in any one of a few different ways. But he preferred to take the "chance," and, having taken the chance, he cannot now be heard to say that taking "chances" was the seamanship of an ordinarily prudent navigator.

There are many points raised and discussed at great length in the able briefs submitted, but it is unnecessary to discuss them all, as the negligence which caused the collision seems glaring and apparent. There were a number of alternatives, which it is fair to assume from the evidence presented, were open to the captain of the Morse to have taken, and thus have avoided the collision. For example, when the Morse was at M–4 on the drawing in evidence, which is the point when the captain first learned that the stern was working to starboard, or even at M–5, which was then, according to his own testimony, 500 feet from the Suedco, when it appeared that the ship would persist in keeping her stern to starboard, if at either one of these locations the captain had ordered full steam ahead and a hard astarboard helm, he would then have been able to bring his ship up head into the wind and tide, and either anchored or gone ahead under the stern of the revenue cutter or out ahead of the cutter, or he could have backed her out between the Suedco and the schooner, between which two ships there was 800 feet of water. To have anchored would doubtless have delayed her proceeding to sea, and this is probably the reason why the captain did not take such steps but preferred to take the "chance" by continuing on the course of full speed astern in the hope that he might escape the bow of the Suedco. In other words, the captain of the Morse took the "chance" and lost, and the ship must bear the consequences.

I ought not to let this opportunity pass without a word of commendation for counsel for the respondent upon his broad attitude in making the concessions he did in his brief, even though the evidence compelled the concessions: (1) Aside from a few differences or variations he was "content to adopt the statement of the case which appeared in the brief of the Suedco." (2) He said: "We are inclined to agree with counsel for the Suedco that this is not a case of inevitable accident." (3) He further said: "We are content to treat the case as one raising a presumption of fault on the part of the Morse." These concessions clarified the issues and materially assisted the court, and they did not tend to confuse them, as charged in libelant's reply brief. It is unfortunate that all briefs submitted are not as commendable, as clear, and as succinct.

As the answer and cross-libel do not allege facts sufficient to exculpate the Morse from the presumption of fault arising from the admitted facts and those affirmatively established, the exceptions are sustained. As the evidence shows that the Morse was clearly at fault, and that the Suedco was not at fault, a decree may be entered in favor of

the libelant for its damages and costs, in accordance with the provisions of the Act of March 9, 1920. The cross-libel of the Morse is dismissed.

Decree accordingly.