**ULSTER OIL TRANSPORT CORP.,** as owner of THE Barge **DWYER NO. 105,** Libellant,

v.

**THE Tug MATTON NO. 25,** Matton Oil Transfer Corporation, Claimant, and
**THE Tug RUSSELL NO. 20;** Russell Bros. Towing Co., Inc., Claimant.

United States District Court
S. D. New York.

Nov. 27, 1959.

Macklin, Speer, Hanan & McKernan, New York City for libellant; Charles J. Carroll, Jr., New York City, of counsel.

Mahar & Mason, New York City, for claimant, Matton Oil Transfer Corporation; Frank C. Mason, New York City, of counsel.

Alexander, Ash & Schwartz, New York City, for claimant, Russell Bros. Towing

Co., Inc.; Edward Ash, New York City, advocate.

CASHIN, District Judge.

Libellant, Ulster Oil Transport Corp., as owner of the Barge Dwyer No. 105, brought this action *in rem* against two tugs. Matton Oil Transfer Corporation claimed Tug Matton No. 25 as owner, and Russell Bros. Towing Co., Inc. claimed Tug Russell No. 20 as charterer. At the trial, the claimants conceded that the libellant must succeed. Thus, the only issue is whether the tugs are jointly liable or whether one of them is solely liable.

When the collision in question occurred, on the afternoon of July 27, 1957, the Tug Matton had in tow, push-fashion, the steel Barge Dwyer No. 105. The Dwyer No. 105 was 230 feet long, 42.3 feet in the beam, was in water ballast and drew about 9 feet. The Tug Matton No. 25 was 83.7 feet long, 23 feet in the beam and was of 2,000 horsepower. At the same time, the Tug Russell No. 20 had in tow, push-fashion, the steel barge Valco 2. The Valco 2 was of approximately the same dimension as the Dwyer No. 105, was loaded and drew about 9 feet. The Tug Russell No. 20 was 78.5 feet long, 22 feet in the beam and was of 690 horsepower.

Immediately prior to the collision, the Matton flotilla was proceeding easterly along the Mohawk River portion of the Erie Canal in the vicinity of Rotterdam Junction near Amsterdam, and the Russell flotilla was proceeding westerly in the same area. A short distance west of the point of collision there was a railroad bridge which had two draws, one on the southerly or starboard side of the Matton and the other on the northerly or port side. The channel at the bridge was approximately 250 feet in width but soon narrowed in the east until, at the point of collision, the channel was approximately 200 feet. The center line of the channel passed northerly of the bridge abutment separating the two draws. East of the point of collision there is a shallow S-shaped bend which,

to an easterly bound vessel, turns first to port and then to starboard. Even though the bend is shallow the existence of shubbery on the northern shore prevents the sighting of vessels of the type involved herein when around the bend. The Matton flotilla proceeded through the northerly draw of the railroad bridge. Soon thereafter the vessels sighted one another but, nevertheless, came into collision on or near the south bank of the river, the Matton, prior to the collision, having come into contact with the bank. The port bow corner of the Valco 2 came in contact at the time of the collision with the port side amidships of the Dwyer No. 105. The Russell admits that it did not blow a bend signal and did not have a lookout posted on the bow of the Valco. Except for the facts set out above, the versions of the claimants as to how the collision occurred are at complete variance.

The version of the Matton is that it blew a bend whistle one-half mile before it reached the bridge. Since no response was received, it took the northerly or port draw of the bridge, which was customary. It slowed its speed from 6 to 4 miles per hour. It had a lookout at the bow of the barge. The lookout sighted the bow of the Valco 2 as it emerged from the last bend. Before the lookout could signal the mate who was navigating the flotilla, the mate, who had simultaneously sighted the Valco, blew a signal for a port to port passing and veered to the starboard side of the channel. The Russell did not return any signal but continued on its course. The Matton continued to veer to starboard and when the Russell continued on a collision course it reversed engines, struck the bank and came to rest. Immediately thereafter, while the Matton flotilla was beached and approximately parallel to the shore, the Russell struck it.

The contradictory version of the Russell is that no signals at all were given by the Matton but that, since the Matton had used the northerly draw of the bridge and thus was on the port side of

the channel, a starboard to starboard crossing was indicated. The Russell signaled for such a crossing but the Matton completely ignored the signal, continued at a high rate of speed, cut across the bow of the Russell flotilla, struck the bank of the river, continued along for a considerable distance scraping the bottom of the barge, and then sprang out into the channel, causing the collision. After the flotilla had come out from the shore it was at an angle to the shore, so that it virtually blocked the channel. The Russell reversed its engines and steered to port so that its bow would move to starboard in an attempt to avoid the collision, but to no avail.

█ Even under the facts as to which there is no dispute, the Russell must be cast in fault since it cannot be said that its failure to blow the bend signal could not have led the Matton into using the north rather than the south draw of the bend. Since such failure is a statutory fault (Pilot Rules for Inland Waters, 33 C.F.R. § 80.5) under the doctrine of The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, a holding that the Russell was at fault is compelled.

A determination as to whether the Matton was also at fault is somewhat more difficult. The testimony of the witnesses for each party is for the most part in accordance with the version of that party. In order to make findings as to what really happened, resort must be had to the inherent probabilities of the situation, to the sparse amount of disinterested testimony and to testing the credibility of the witnesses because of their demeanor on the stand and any possible inconsistencies in their testimony. By the utilization of these instrumentalities, I am led to the conclusion that the Matton was not at fault.

Even though the Matton used the north draw of the bridge, nevertheless, because of the fact that the center line of the channel was north of the bridge abutment separating the two draws, the Matton flotilla was still close to the center line of the channel as it emerged from the bridge. Thus, the normal ac-

tion it would take would be to turn to the starboard to assume a course on the normal side of the channel. Since the Russell flotilla was rounding the bend, of necessity this maneuver entailed the "crossing of the bow" of the Russell flotilla. However, this cannot be deemed fault on the part of the Matton since, if the Russell had made an ordinary turn, maintaining the starboard side of the channel, the Matton would have to beach itself on the north shore to avoid any crossing of the Russell's bow. A very significant item of evidence supporting the conclusion that a conventional port to port passing was indicated, can be found in the testimony of the deckhand of the Russell, who, on direct examination, stated:—"As he [the Matton flotilla] came into sight he was like I say, a head-on situation * * *". (S.M. 114). Thus, the vessels should have passed port to port in accordance with the Pilot Rules for Inland Waters (33 C.F.R. § 80.4). The testimony of a disinterested witness also supports my conclusion. This witness, a woman who lived on the south shore of the river near the point of the collision, testified that the Russell flotilla was moving westerly just seconds before the time of the collision. (S.M. 77–78).

█ In view of the above, I find that the Matton blew a bend signal. When it received no response it considered the channel clear and so reasonably took the customary draw of the bridge. Upon sighting the Russell it signaled for a port to port passing and steered to the starboard side of the channel. The Russell, however, failed to go to starboard, continued on a collision course and struck the Dwyer No. 105 while the Matton flotilla was beached on the south side of the river.

The foregoing shall constitute my findings of fact and conclusions of law.

An interlocutory decree may be settled dismissing the libel as to the Matton No. 25 without costs, granting judgment against the Russell No. 20 with costs, and referring the issue of damages to a Commissioner.