**Edward H. TEMPEST, Libelant,**

v.

**The UNITED STATES of America, Respondent.**

**No. 8589.**

United States District Court
E. D. Virginia,
Norfolk Division.

Dec. 13, 1967.

Morton H. Clark, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for libelant.

Robert M. Hughes, III, Seawell, Mc-Coy, Winston & Dalton, Norfolk, Va., for respondent.

MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

The crux of this case is the extent to which Article 25 of the Inland Rules of Navigation, 33 U.S.C. § 210, generally known as the Narrow Channel

Rule,[1] is applicable to a given situation. While the Narrow Channel Rule is applicable to the type vessels involved herein, since it specifically refers to "steam vessels", 33 U.S.C. § 210, and the term "steam vessel" is defined by the Inland Rules of Navigation as "any vessel propelled by machinery", 33 U.S.C. § 155, it is difficult to interpret the meaning of the term "narrow channel" as applied to the facts of this case, as well as the words "safe and practicable" as used in the Rules.

The collision in question occurred at approximately 7:30 A.M. on July 3, 1965, under a span of the Lesner Bridge at Lynnhaven Inlet, Virginia Beach, Virginia. The libelant, Edward H. Tempest, was the owner of a 29-foot Pacemaker yacht called the TEMPEST II, having a beam of ten feet six inches. The respondent, United States of America, was the owner of a 28-foot motor vessel known as the DEVIL DOG, which was operated by the Fleet Marine Force, Atlantic, Special Services, through its employee, Richard L. Brewer. Initially both vessels were proceeding seaward, with the DEVIL DOG well in advance of TEMPEST II. As a matter of fact, the DEVIL DOG had cleared the span of the Lesner Bridge by approximately 150 feet prior to the TEMPEST II entering the eastern span where the collision ultimately took place.

The Lesner Bridge, crossing the Lynnhaven Inlet, consists of three supports or concrete pilings underneath the vehicular roadway. Headed outbound or seaward, the marked channel is on the west between the westernmost and center pilings. This channel carries the major portion of the outbound and inbound water traffic. The fixed bridge has a total horizontal clearance of 80 feet, a total vertical clearance of 35 feet, and an authorized clearance of 49 feet. The exact dimensions of the clearance for the western and eastern spans (headed

seaward) are not shown from the record. Estimates of same for the eastern opening range from 25 to 45 feet, with the western span being somewhat wider.

On the morning in question a dredge was anchored immediately north of the westernmost piling, but not appreciably obstructing water traffic in the marked channel. A recently constructed pipeline ran from the dredge in a southerly direction adjacent to and parallel with the westernmost piling or abutment. There remained sufficient room for small boats to navigate the marked channel when the approach was made from a north-south direction.

The TEMPEST II started from its slip in Long Creek Marina—southeast of the Lesner Bridge—and proceeded westerly with a group of prospective fishermen with the intention of taking the marked channel under the Lesner Bridge, and thereafter following the channel to the flashing red buoy marking the outer limits of the channel where the depth of the water was no longer a problem. The operator of the TEMPEST II was the libelant. As he approached the Lesner Bridge with the intention of navigating the marked channel, he noticed the dredge and pipeline on the extreme port side of the channel. He turned to his port, making a complete circle, and concluded that his best course would be to enter the eastern span which was not a marked channel. As the TEMPEST II came abreast of the fender system of the center abutment or piling—but not under the bridge trestles—the operator first noticed the DEVIL DOG approaching his vessel at an angle, at which time, according to his estimate, the DEVIL DOG was about 150 feet north or northeast of the TEMPEST II. Undoubtedly, the TEMPEST II was on the port side of the easternmost opening under the Lesner Bridge, approximately parallel to the piling, when the DEVIL DOG collided with the libelant's yacht. The

---

1. 33 U.S.C. § 210 reads:
 "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-

channel which lies on the starboard side of such vessel."
 The Coast Guard Pilot Rules carry an identical provision, 33 C.F.R. § 80.10.

tide was ebbing approximately four knots over the ground. The point of impact on the two vessels was about 7 to 8 feet abaft the beam on each starboard bow, but the Court accepts the testimony that the DEVIL DOG approached the TEMPEST II at an approximate 45 degree angle until just prior to the impact when the DEVIL DOG managed to maneuver almost to the point of reciprocal courses. The impact, while not apparently too severe, caused the TEMPEST II to be driven against the fender system on its port side.

The DEVIL DOG had initially negotiated the marked channel to the west, headed seaward. Apparently this vessel came in contact with the pipeline and fended off same. In any event, the DEVIL DOG had experienced a steering casualty and attempted to return to Lynnhaven Inlet through the same span or opening being negotiated by the TEMPEST II. The only other alternatives confronting the operator of the DEVIL DOG were to go aground at a point immediately northeast of the easternmost abutment or piling or, prior thereto, stopping her engines when she hit the pipeline but, under such circumstances, the tide would have taken the DEVIL DOG outward. Taking a wide sweep, the DEVIL DOG headed directly for the TEMPEST II. It is true that if the TEMPEST II had been negotiating the eastern opening on the eastern half of same, the collision perhaps would have been avoided as the vessels would probably have passed port to port. Despite this latter conclusion, we do not believe that the situation calls for the harsh application of the "Pennsylvania Rule", The Pennsylvania, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148.

 It is not suggested that a keep-to-the-right rule is wholly inappli-

cable in all cases where small boats are approaching bridge spans in opposite directions. Practical navigation dictates that vessels, when on reciprocal courses, should each keep to the starboard in the absence of signals to the contrary. Assuming arguendo that the eastern opening constituted a "narrow channel", we think it nevertheless "practicable" for the TEMPEST II to enter the opening on the port half of same, bearing in mind the distance to the north that the DEVIL DOG was at the time.

There is a serious question as to whether the eastern span or opening constitutes a "narrow channel". Respondent would have us treat both the marked (western) channel and the eastern opening as separate narrow channels. Libelant, on the other hand, urges that the marked (western) channel was the only "narrow channel" but, in the alternative, insists that the entire east and west openings constituted the "narrow channel", and therefore, the DEVIL DOG violated the Narrow Channel Rule. The issue is not free from doubt and, despite a diligent search, no controlling authority meets the precise point.[2]

While we think it sufficient to state that it was "safe and practicable" for the TEMPEST II to enter the opening on the port side thereof and, because of the danger of shallow water on the starboard side, it may not have been "practicable" to maneuver on the starboard side, we would much prefer a finding that, under the particular facts, the Narrow Channel Rule is inapplicable. In the alternative, we feel that it is just as logical to conclude that the entire Lesner Bridge opening (east and west spans) constituted one "narrow channel", as it would to arrive at a finding that each opening constituted a separate "narrow channel". To hold otherwise

---

2. The importance of the interpretation is not limited to this case. The recently constructed Chesapeake Bay Bridge-Tunnel is 17 miles in length. It has two clearly marked channels; one for the Baltimore harbor and one for the Port of Hampton Roads, under which tunnels permit the passage of vehicular traffic. The remainder of this project consists of a bridge with many supports or piles. There are probably as many as 1000 openings which would permit the passage of small boats the size of those involved in this case.

would result in navigation confusion with small vessels using either span or opening and then, after clearing same, crossing in front of water traffic using the other opening.

■ Certainly not every confined body of water constitutes a "narrow channel" even though water traffic passes within it. For example, it does not include harbor waters, with piers on each side, where the necessities of commerce require navigation in every conceivable direction. The Number 4, 161 F. 847 (2 Cir., 1908); The Islander, 152 F. 385 (2 Cir., 1907), cert. den. 205 U.S. 546, 27 S.Ct. 792, 51 L.Ed. 923. Nevertheless, a collision in harbor waters within piers could readily be determined on a failure to keep-to-the-right predicate.

■ The record is not clear as to the extent of use of the eastern opening by vessels of the size and type involved herein. Nor does the testimony reflect the depth available in the eastern span.[3] We are not advised as to how much water each vessel would draw. While it must be conceded that small boat traffic has used the eastern span, no finding can be made reflecting that small boats of the size of the DEVIL DOG and TEMPEST II continuously used this approach. Brewer, the operator of the DEVIL DOG, stated that he had intended to use the eastern span, but later changed his mind and entered the marked channel where he lost his steering control and struck the pipeline. Brewer intimated that it was not customary to

use the eastern span when going to sea. These are pertinent inquiries as it is generally recognized that, in determining the existence of a "narrow channel", one must look at the physical dimensions of the area and the character of navigating use to which the water is put. Skibs A/S Siljested v. S. S. Mathew Luckenbach, 215 F.Supp. 667, 681–682 (S.D. N.Y., 1963), aff. on opinion of district judge, 324 F.2d 563 (2 Cir., 1963). The latter authority, while not factually alike, expresses the view of this Court that the determination of a "narrow channel" is a mixed question of law and fact and that, under particular facts, a confined body of water—even though navigable —need not necessarily fall within the Narrow Channel Rule, although good seamanship requires everyone to keep to the right when it is safe and practicable.

There is little need to discuss the many authorities touching upon a "narrow channel". A brief summary is set forth in the footnote.[4] Respondent's reliance upon United States v. The J. A. Cobb, 182 F.Supp. 234 (S.D.N.Y., 1959), affirmed 283 F.2d 754 (2 Cir., 1960), is misplaced. In that case there were two channels, the east channel being 134 feet in width, and the west channel being 216 feet in width, with a center abutment 200 feet in width separating the channels. It was the custom for larger vessels and tows to use the broader west draw. The Court rejected the theory that the east and west channels should be merged to constitute a single narrow

---

3. The marked channel area depth is clearly delineated on the Coast Guard chart with depths of 4 to 18 feet.

4. The Lexington, 275 F. 279 (2 Cir., 1921), holding that Narragansett Bay did not constitute a "narrow channel" within the meaning of Article 25; The Oliver, 22 F. 848 (E.D.Va., 1885), defining a "channel" but not in the context of the Narrow Channel Rule; Esso Standard Oil Company v. Oil Screw Tug Maluco I, 332 F.2d 211 (4 Cir., 1964), where the statutory fault was clearly within a marked channel; Harbor Towing Corporation v. Tug Reliance, 211 F. Supp. 896 (E.D.Va., 1963), holding that

Article 25 may be applied in rivers and bays where the area is confined and water traffic passes in substantially opposite directions; Barge Lake Farge Corporation v. The S. S. Saxon, 183 F.Supp. 132 (E.D.Pa., 1960), affirmed sub nom. Saxon Steamship Company v. The Anna Sheridan, 286 F.2d 247 (3 Cir., 1961), treating the openings created by a swing span as one channel requiring the application of the Narrow Channel Rule; Ulster Oil Transport Corp. v. The Matton No. 25, 185 F.Supp. 689 (S.D.N.Y., 1959), affirmed 286 F.2d 484 (2 Cir., 1961), defining the narrow channel without regard to the location of the spans.

channel.[5] However, as Judge Weinfeld said in his opinion: "The Rule is not absolute. It is not required that it be rigidly and blindly followed in all cases".

■■ Tested by these principles, we conclude that the Narrow Channel Rule, as applied to the facts of this case, would be applied only with respect to a collision in the westernmost marked channel, and that any passing in the eastern span would be governed solely by the rule of prudent navigation. As the alleged violation of the Narrow Channel Rule is the only fault charged to the TEMPEST II, the Court finds that the DEVIL DOG is solely responsible for the collision.

■ Respondent contends that the TEMPEST II came in contact with the fender system prior to the approach of the DEVIL DOG and, therefore, the major portion of the damage is attributable to this prior act of navigation. Rejecting this contention, the Court finds that the TEMPEST II did not come in contact with the fender system until it was struck by the DEVIL DOG.

■ Respondent concedes that the DEVIL DOG was a public vessel within the meaning of the Public Vessels Act. With this concession, it is unnecessary to consider the factual situation relating to the ownership and operation of the DEVIL DOG. On the basis of this record, it is the opinion of the Court that the vessel in question is a public vessel within the Public Vessels Act. At the time of the collision on July 3, 1965, the DEVIL DOG was titled in the name "H & S Battalion, FMFLANT", a non-appropriated fund activity operated by the Fleet Marine Force, U. S. Atlantic Fleet; the DEVIL DOG was, on July 3, 1965, being operated by Lance Corporal Richard L. Brewer, U. S. Marine Corps, who received his salary from appropriated funds, but was on assigned duty to Special Forces; the vessel was acquired by H & S Battalion, FMFLANT, on or about May 1, 1965, from the U. S. Navy, and the source of funds used in its original acquisition by the Navy is unknown; the vessel is used by the Marine Corps for recreation purposes, with members of the Marine Corps and their families being entitled to use the DEVIL DOG at no charge, other than the cost of the fuel; at all times when the boat is so used, it is under the ultimate control of Brewer, or some other personnel so designated, although the Marine Corps personnel for whose benefit the boat is operated would probably suggest where the vessel should be taken for fishing or other recreation purposes, with the final veto power resting in Brewer; assigned personnel, such as Brewer, is always in charge of the actual navigation of the boat; that H & S Battalion operates a recreation fund and all profits realized are for the benefit of Marine Corps personnel and their dependents; and that funds can come from appropriated sources allotted to Special Services for recreation purposes, but that the vast majority of funds are non-appropriated.

■ While the issue is not without question, we believe that a non-appropriated fund activity of the Armed Forces may own and operate a "public vessel" used solely for recreation purposes. The status of post exchanges and commissaries has been considered. Standard Oil Co. of California v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942); Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); United States v. Holcombe, 277 F.2d 143 (4 Cir., 1960). The furnishing of recreational facilities for members of the Armed Forces appears to be an integral part of the operation of the military. In any event, it is not material in this case due to the concession aforesaid.

5. If such a theory is accepted in the present case, the DEVIL DOG might be a violator of the Narrow Channel Rule.