**MARITRANS OPERATING PARTNERS L.P., Plaintiff,**

v.

**M/T FAITH I; Wallem Ship Management Ltd.; PLM Investment Management Inc.; Transpetrol Maritime PTE Ltd.; Alice G. Faith Ltd., Defendants.**

Civ. A. No. 90–3292.

United States District Court,
D. New Jersey.

Aug. 12, 1992.

James W. Johnson, E. Michael Keating, Clark, Ladner, Fortenbaugh & Young, Cherry Hill, N.J., for plaintiff.

James T. Shirley Jr., Jeanne–Marie Downey, Haight, Gardner, Poor & Havens, New York City, Mary Elisa Reeves, Krusen, Evans & Byrne, Collingswood, N.J., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROTMAN, District Judge:

This maritime action arises out of the collision of the tug and barge Independence/Ocean 192 with the tanker vessel M/T Faith I at about 12:36 a.m. on August 19, 1990 approximately one-half mile south of the entrance to the Delaware Bay for deep draft vessels. A bench trial on the issue of liability was held on February 18–19, 1992 and on May 4–5, 1992. After considering the evidence presented and the arguments and submissions of counsel, the court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. The M/T Faith I is a 32,500 deadweight ton single screw steel vessel built in 1974, of 609 feet in length and 86 feet in beam, registered in the Bahamas. At all relevant times her deep draft was 35 feet.

2. At all relevant times, the M/T Faith I was owned by defendant Alice G. Faith Ltd., operated by defendant Wallem Ship Management Ltd. and chartered by defendant Transpetrol Maritime PTE Ltd.[1]

3. The tug Independence is a twin-screw steel hull towing vessel of 82 feet in length and 6000 horsepower. The barge Ocean 192 is a steel tank vessel of 479.6 feet in length and 84 feet in beam subdivided into six cargo tanks, each with a port and starboard compartment. At all relevant times on August 19, 1990, the Independence was made fast to and pushing in the notch on the stern of the Ocean 192. The total length of this configuration was 525 feet and the deepest draft was 28 feet, 6 inches.

4. The tug Independence and the barge Ocean 192 are, and were at all times material to this action, owned and operated by plaintiff Maritrans Operating Partners, L.P. ("Maritrans").

5. The entrance/exit of the Delaware Bay for deep draft vessels is marked on its western extreme by Buoy number 5 and on its eastern extreme by Buoy number 6. The distance between the two buoys is approximately 1.2 miles. Buoy number 8 is approximately 1.5 miles north of Buoy number 6. At all relevant times, the Independence/Ocean 192 and the M/T Faith I were deep draft vessels.

6. On August 18, 1990 at about 4:15 p.m., the Independence/Ocean 192 departed the BP Marcus Hook, Pennsylvania refinery heading down the Delaware River towards the Delaware Bay with a cargo of gasoline. Mate Matthew Frankowski was at the conn. At about 5:45 p.m., Captain Frederick Bush relieved Mate Frankowski at the conn.

7. On August 18, 1990 at about 11:45 p.m., Mate Frankowski relieved Captain Bush. Standing watch with Mate Frankowski and acting as a look-out was Able Seaman Robert Hopkins. The Independence was equipped with two operating radar units and three operating VHF units. Mate Frankowski monitored the radar and was responsible for operating the engine controls and the VHF units. The Independence/Ocean 192 was outbound heading south down the Delaware Bay passing approximately two-tenths of a mile off of Buoy Number 8 and Buoy Number 6 on its port side at a speed of approximately 12 knots.

8. Per Captain Bush's instructions, Mate Frankowski intended exiting the Delaware Bay within approximately two-tenths of a mile of Buoy number 6 and then heading east by turning to port into the outbound traffic lane of the Five Fathom

---

**1.** The parties have neither stipulated to nor have they presented evidence on defendant PLM Investment Management Inc.'s relation to the M/T Faith I.

Bank Sea Lane once clear of the Delaware Bay entrance. The Five Fathom Bank Sea Lanes run east and west. According to Captain Bush, the pilot station requested that outbound tugs were to stay to the east side of the Delaware Bay to accommodate vessels entering the nearby pilot area located within the Delaware Bay. Captain Bush testified that he has never seen this request in writing.[2] If not for this request, Captain Bush testified that he would have instructed Mate Frankowski to navigate down the west side of the Delaware Bay close to Buoy number 5. February 18, 1992 Transcript at 190–193; May 4, 1992 Transcript at 28–31. Moreover, Captain Richard McClean, Maritrans' expert in the area of navigational responsibilities, prudent seamanship and the rules of the road, also testified that it was the usual procedure, in accordance with the precautions required by the ordinary practice of mariners for vessels leaving the Delaware Bay, to stay on the west side close to Buoy Number 5. February 19, 1992 Transcript at 121–122, 142–143.

9. On August 18, 1990 at about 11:40 a.m. after arriving from Tarragona, Spain with a cargo of vacuum gas oil bound for Philadelphia, Pennsylvania, the M/T Faith I anchored near the seaward entrance to the Five Fathom Bank Sea Lane access to the Delaware Bay.

10. On August 18, 1990 at about 9:20 p.m., the M/T Faith I's anchor was aweigh and she was heading east at a speed of approximately 12 knots, toward the entrance to the Delaware Bay in the inbound traffic lane of the Five Fathom Bank Sea Lane. At all relevant times, the M/T Faith I was on hand steering.

11. The bridge of the M/T Faith I was initially manned by Captain Misra Yogesh Kumar, Second Officer Obaid Kayani and a helmsman. There was a scheduled watch change at midnight so that at 11:55 p.m. on August 18, 1990, helmsman Isidro Ducanes took the wheel and at 12:25 a.m. on August 19, 1990, Second Officer Michael Jacob relieved Kayani. The M/T Faith I was equipped with two operating radar units and two operating VHF units. Captain Misra monitored the movements of the vessel and also watched the radar. Second Officer Jacob watched the radar, controlled the VHF units and made entries in the deck log book and the deck maneuvering order book.

12. At about 12:15 a.m. on August 19, 1990, the M/T Faith I detected the Independence/Ocean 192 visually and by radar. At about 12:25 a.m. the Independence/Ocean 192, detected the M/T Faith I visually and by radar.

13. At about 12:24 a.m., the M/T Faith I's engines were ordered half ahead. At about 12:26 a.m., the M/T Faith I initiated a VHF communication with the pilot tower regarding dispatching a pilot to the M/T Faith I. Pursuant to this conversation, Captain Misra intended to turn to starboard towards the Delaware Bay close to Buoy number 6 after picking up Pilot Walter Howard Jr. who was heading towards the M/T Faith I aboard the pilot boat. November 13, 1991 *De Bene Esse* Transcript of Captain Misra at 143.[3] At about 12:27 a.m., the M/T Faith I's engines were ordered slow ahead.

14. At about 12:27 a.m., Mate Frankowski initiated a VHF communication with the M/T Faith I. Mate Frankowski requested a port to port passage which was rejected by the M/T Faith I because it could not take Buoy number 6 on its port side. The M/T Faith I countered with a request for a starboard to starboard passage and that was rejected by the Independence/Ocean 192 because it could not take Buoy number 6 off of its starboard side. After the response by the Independence that it had rejected the M/T Faith I's counter-proposal, the M/T Faith I told the Independence/Ocean 192 that the M/T Faith I would stop its engines and let the Indepen-

---

**2.** In responding to defendants' interrogatories, Maritrans stated that it was unaware of any practice, request or instructions for southbound tugs to keep to the eastern side of the Delaware Bay. February 19, 1992 Transcript at 166–168.

**3.** Captain Misra's *de bene esse* testimony has been admitted into evidence as Joint Exhibit 41.

dence/Ocean 192 "pass ahead" of the M/T Faith I. November 13, 1991 *De Bene Esse* Transcript of Second Mate Jacob at 20, 25.[4]

15. At about 12:30 a.m. on August 19, 1990, the M/T Faith I stopped its engines. At about 12:35 a.m., the M/T Faith I went full astern and its rudder was turned hard to starboard to avoid a collision with the Independence/Ocean 192. If the M/T Faith I would have gone full astern or its rudder turned hard to starboard between 12:30 a.m. and 12:33 a.m., the collision would not have occurred.

16. After the VHF communication with the M/T Faith I, the Independence/Ocean 192 maintained its speed of about 12 knots and continued on its course approximately two-tenths of a mile from Buoy number 8 and Buoy number 6 on the eastern side of the Delaware Bay. At about 12;35 a.m., the Independence/Ocean 192 was switched from automatic pilot to hand steering and the rudder was turned hard to starboard to avoid a collision with the M/T Faith I. If the Independence/Ocean 192 had navigated towards the western side of the Delaware Bay close to Buoy number 5, the collision would not have occurred.

17. A collision occurred at about 12:36 a.m. on August 19, 1990 between the M/T Faith I and the Independence/Ocean 192 approximately one-half mile south of Buoy number 6. The M/T Faith I's bow penetrated the port quarter of the Ocean 192 at an angle of approximately 90 degrees. At all relevant times leading up to the collision, the Independence/Ocean 192 was on a course approximately 45 degrees or four points[5] off the M/T Faith I's starboard bow.

18. At the time of the collision the vessels were navigating in an area to which the 1972 International Regulations for Preventing Collisions at Sea, Rules Following 33 U.S.C. § 1602, applied to govern the conduct of the vessels in respect to each other. The vessels were also navigating in a Precautionary Area in which mariners must exercise extreme care when navigating.

19. No whistle signals were sounded by either vessel prior to the collision, and neither vessel had posted a bow lookout at any relevant time.

20. Except for the VHF communication initiated by Mate Frankowski at about 12:27 a.m., no further communication occurred between the two vessels prior to the collision.

21. Prior to the collision, neither of the vessels took compass bearings or radar plots of the other vessel to determine the speed and the changes in the speed of the other vessel. Captain Norman Cockcroft, defendants' expert in the fields of navigation, collision regulations and collision analysis, testified that it should have been apparent to the M/T Faith I crew by the use of radar that the Independence/Ocean 192 was on a course heading close to Buoy number 6 on the eastern side of the Delaware Bay. May 4, 1992 Transcript at 163–165, 181.

22. At all relevant times, the weather was clear and visibility was good.

23. No other vessel interfered with or affected the navigation of either the M/T Faith I or the Independence/Ocean 192.

## II. CONCLUSIONS OF LAW

A) Rule Violations

In 1874, the Supreme Court established *The Pennsylvania* Rule for determining fault in maritime collisions:

[W]hen a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more that a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

**4.** Second Mate Jacob's *de bene esse* testimony has been admitted into evidence as Joint Exhibit 42.

**5.** A point on the compass is 11 and one-fourth degrees.

*The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874); *Cliffs–Neddrill Turnkey v. M/T Rich*, 947 F.2d 83, 86–87 (3d Cir.1991). Since at the time of the collision the vessels were navigating in an area to which the 1972 International Regulations for Preventing Collisions at Sea, Rules Following 33 U.S.C. § 1602, ("Rules") applied to govern the conduct of the vessels in respect to each other, the court must determine which of these rules were violated and if such violation could reasonably have been a cause of the collision. Because the rules are intended to be read together with no specific rule superseding any other rule, *LoVuolo v. Gunning*, 925 F.2d 22, 26 (1st Cir.1991), the court will consider all rule violations that could reasonably have been a cause of the collision.

### i) Crossing Rules

There are three crossing rules that are applicable to this case. Rule 15 (Crossing situation) provides that "[w]hen two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel." Rule 16 (Action by give-way vessel) provides that "[e]very vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear." Finally, Rule 17 (Action by stand-on vessel) provides in relevant part:

(a)(i) Where one of two vessels is to keep out of the way the other shall keep her course and speed.

(a)(ii) The latter vessel may however take action to avoid collision by her manoeuvre alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

(b) When, from any cause the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best avoid the collision.

■ A crossing situation exists when two vessels are approaching each other on steady courses which vary by one point or more. *LoVuolo* at 27; *Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 823 (9th Cir.1988); *In re Ocean Foods Boat Co.*, 692 F.Supp. 1253, 1261 (D.Or.1988); *A/S Skaugaas v. T/T P.W. Thirtle*, 227 F.Supp. 281, 291 (D.Md.1964); *The Corozal*, 62 F.Supp. 123, 125 (S.D.N.Y.1944). It is not necessary that the vessels intend to cross each others paths, only that "the continuance of both vessels upon their courses should bring them into such proximity or under such conditions as would involve risk of collision." *The Tamanend*, 40 F.2d 288, 290 (E.D.Pa.1929). The crossing rules only apply where the vessels can see each other. *Zim Israel Navigation Co., Ltd. v. Special Carriers, Inc.*, 611 F.Supp. 581, 586 (E.D.La.1985); *Borcich v. Ancich*, 191 F.2d 392, 395 (9th Cir.1951).

A crossing situation existed between the M/T Faith I and the Independence/Ocean 192 in which the M/T Faith I was the give-way vessel and Independence/Ocean 192 was the stand-on vessel. The M/T Faith I and the Independence/Ocean 192 were approaching each other on steady courses that varied by approximately four points or forty-five degrees. Moreover, visibility was good and the vessels were able to see each other when they were still at least five miles apart and were able to continually keep track of each other's position.

■ The crossing rules place the primary responsibility on the give-way vessel to keep out of the way of the stand-on vessel and to take early and substantial action to keep well clear of the stand-on vessel. The M/T Faith I violated Rules 15 and 16 because as the give-way vessel, it failed to take such early and substantial action to keep well clear and out of the way of the Independence/Ocean 192. *Capt'n Mark v. Sea Fever Corp.*, 692 F.2d 163, 166 (1st Cir.1982); *The Gulfstar*, 136 F.2d 461, 464 (3d Cir.1943); *United States v. Delaware Bay & River Pilots Association*, 44 F.2d 1, 3 (3d Cir.1930); *Makin v. Empresa Lineas Maritimas Argentinas*, 630

F.Supp. 1168, 1171 (D.Mass.1986); *Zim Israel* at 586; *Matter of Ta Chi Navigation (Panama) Corp., S.A.*, 513 F.Supp. 148, 152 (E.D.La.1981). After the VHF communication with the Independence/Ocean 192, the M/T Faith I stopped its engines at about 12:30 a.m. The M/T Faith I waited until approximately one minute before the collision to turn its rudder hard to starboard and to go full astern. If either of these actions were taken immediately after the VHF communication, the collision would not have occurred.

Nothing stated in the VHF communication between the two vessels relieves the M/T Faith I of its duties under the crossing rules. As Second Mate Jacob testified, he informed the Mate Frankowski that the M/T Faith I would stop its engines and let the Independence/Ocean 192 "pass ahead" of it. However, since the M/T Faith I was awaiting the arrival of Pilot Howard who was approaching the vessel aboard the pilot boat, the M/T Faith I did not intend on turning to starboard until after picking up Pilot Howard. The M/T Faith I's violation of the crossing rules was a proximate cause of the collision.

 The Independence/Ocean 192 did not violate the crossing rules. Rule 17 requires the stand-on vessel to maintain her course and speed unless it becomes apparent that the give-way vessel is not taking appropriate action to keep away from it. *Potomac Transport, Inc. v. Ogden Marine, Inc.*, 909 F.2d 42, 45 (2d Cir. 1990); *Sawyer v. McDonald*, 165 F.2d 426, 429 (5th Cir.1948); *The Gulfstar* at 464–465; *Ocean Foods* at 1262; *Rose & Lucy, Inc. v. F/V Saint Anna Maria*, 252 F.Supp. 76, 79 (D.Mass.1966); *Standard Oil Co. of New Jersey v. United States*, 92 F.Supp. 696, 699–700 (S.D.N.Y.1950). The stand-on vessel is required to take such action as will best avoid the collision when it finds itself in an *in extremis* situation so close to a collision that the action of the give-way vessel alone could not avoid a collision. *Capt'n Mark* at 168 n. 3; *Pacific–Atlantic S.S. Co. v. United States*, 175 F.2d 632, 640 (4th Cir.1949); *The Gulfstar* at 465; *Zim Israel* at 588.

After the VHF communication, the Independence/Ocean 192 maintained it course on the eastern side of the Delaware Bay close to Buoy number 6 and its speed of approximately 12 knots. As the stand-on vessel, the Independence/Ocean 192 was entitled to assume that the M/T Faith I would obey the crossing rules and stay clear. *See Zim Israel* at 589. When it became evident that the M/T Faith I was not taking appropriate action to keep away from it, despite Second Mate Jacob's statement that the M/T Faith I would allow the Independence/Ocean 192 to "pass ahead," Mate Frankowski switched from automatic pilot to hand steering and turned the Independence's rudder hard to starboard. Although this *in extremis* action may have contributed to the collision with the M/T Faith I by swinging the Ocean 192's port stern towards the M/T Faith I's bow, the Independence/Ocean 192 is not at fault. As the Third Circuit stated almost fifty years ago in *The Gulfstar*, "[w]hen the master of a vessel is confronted with a sudden peril, caused by the action of another vessel, so that he is justified in believing that collision is inevitable and he exercises his best judgment in the emergency, his action, even though unwise, cannot be regarded as fault." *The Gulfstar* at 465.

*ii) Starboard Side Rules*

Rule 9 (Narrow channels) states in relevant part that "[a] vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable." Rule 2 (Responsibility) states in relevant part that "[n]othing in these Rules shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seaman, or by the special circumstances of the case."

 The application of the narrow channel rule is based on the physical dimensions and the character of the navigating use of the body of water. *Garrett v. Higgenbot-*

*ham,* 800 F.2d 1537, 1539 n. 5 (11th Cir. 1986); *Weathers Towing, Inc. v. M/V Herman Pott,* 570 F.2d 1294, 1295 (5th Cir. 1978); *Williamson Leasing v. American Commercial Lines,* 616 F.Supp. 1330, 1337–1338 (E.D.La.1985); *Tempest v. United States,* 277 F.Supp. 59, 63 (E.D.Va.1967). As a result, bodies of water in which vessels navigate in opposite directions and where the necessities of commerce do not require navigation in every conceivable direction may be narrow channels. *Skibs A/S Siljestad v. S/S Mathew Luckenbach,* 215 F.Supp. 667, 681–683 (S.D.N.Y.1963).

Courts have held that bodies of water that are up to a 1,000 feet wide to be narrow channels. *Williamson Leasing* at 1338 (80 feet wide area); *Red Star Towing & Transportation Co. v. Tug Catherine,* 305 F.Supp. 639, 642 (S.D.N.Y.1969) (1,000 feet wide); *Lee v. Candies,* 216 F.Supp. 665, 666 (E.D.La.1963) (150 feet wide); *The H.A. Baxter,* 182 F. 930, 932 (D.R.I.1908); *see also Flowers Transportation, Inc. v. American River Transportation Co.,* 485 F.Supp. 731, 732, 739–740 (N.D.Miss.1980) (1,200 feet wide area not a narrow channel); *St. Philip Offshore Towing Co. v. Wisconsin Barge Lines,* 466 F.Supp. 403, 410 (E.D.La.1979) (1,200 feet wide area not a narrow channel). Courts have also determined that certain sections of the Delaware River north of the Delaware Bay are narrow channels. *The Florence,* 186 F. 57, 62 (3d Cir.1911) (area just south of Philadelphia); *Petition of Oskar Tiedemann & Co.,* 289 F.2d 237, 239 (3d Cir.1961) (Deepwater Range south of New Castle, Delaware); *Afran Transport Co. v. S/T Maria Venizelos,* 450 F.Supp. 621, 624, 634 (E.D.Pa.1978) (800 feet wide area of Marcus Hook Range extending south from the Delaware Memorial Bridge to the intersection of the Delaware River and the Schuylkill River); *Holland–America Line v. M/V Johs. Stove,* 286 F.Supp. 69, 70–71 (S.D.N.Y.1968) (Mifflin Range just south of Philadelphia); *Barge Lake Farge Corp. v. The S.S. Saxon,* 183 F.Supp. 132, 135 n. 1 (E.D.Pa.1960) (300 feet wide area off the northeastern part of Philadelphia); *Petition of Terminal Transport Co.,* 157 F.Supp. 446, 448, 450 (E.D.Pa.1957) (800

feet wide area of the Tinicum Range); *Tug New York Co. v. The Robin Doncaster,* 130 F.Supp. 136, 138, 141 (E.D.Pa.1955) (1,000 feet wide area just north of the Benjamin Franklin Bridge); *The Texas,* 207 F. 669, 672 (D.Del.1913) (area off of Marcus Hook).

The area in between and in the vicinity of Buoy number 5 and Buoy number 6 which is the entrance/exit of the Delaware Bay for deep draft vessels is not a narrow channel. The distance between Buoy number 5 and Buoy number 6 is approximately 1.2 miles or 6,336 feet wide. The beams of the M/T Faith I and the Independence/Ocean 192 were approximately 170 feet combined leaving more than enough room for these vessels to pass each other even if they were both closer to Buoy number 6 than to Buoy number 5. Moreover, the entrance/exit to the Delaware Bay is close to the pilot area located in the Delaware Bay where vessels do not just navigate in opposite directions.

Even if the narrow channel rule is not applicable, when good seamanship and prudent navigation require that every vessel keep to starboard in a specific body of water if safe and practicable, Rule 2 applies. *See Barge Poling Bros. No. 23, Inc. v. A.S. Namset,* 429 F.Supp. 1315, 1322 (S.D.N.Y.1977); *Tempest* at 63–64; *Skibs* at 681–682. Rule 2 applies to this case. Captain Bush testified that he would have instructed Mate Frankowski to navigate down the west side of the Delaware Bay close to Buoy number 5 if not for the unwritten request of the pilot station that outbound tugs stay to the east side of the Delaware Bay to accommodate vessels entering the pilot area. In addition, Captain McClean, Maritrans' expert in the area of navigational responsibilities, prudent seamanship and the rules of the road, also testified that it was the usual procedure, in accordance with the precautions required by the ordinary practice of mariners for vessels leaving the Delaware Bay, to stay on the west side close to Buoy Number 5.

This is not a case where a proved local custom conflicts with the requirements of good seamanship and prudent navigation.

See Canal Barge Co., Inc. v. China Ocean Shipping Co., 770 F.2d 1357, 1361 (5th Cir.1985); *A.F.A. Tanker* at 608; *Hogge v. SS Yorkmar,* 434 F.Supp. 715, 727 (D.Md. 1977). Maritrans stated that it was unaware of any practice, request or instructions for southbound tugs to keep to the eastern side of the Delaware Bay. Even Captain Bush, who instructed Mate Frankowski to navigate down the east side of the Delaware Bay, testified that he has never seen this request in writing. This being the case, there is no reason that the M/T Faith I, a vessel registered in the Bahamas and arriving from Spain, should have been aware of this alleged request.

■ The court must determine whether the Independence/Ocean 192's violation of Rule 2, by navigating on the eastern side of the Delaware Bay, was a contributing cause of the collision and not just a condition preceding the collision. *See Pennsylvania Railroad Co. v. S.S. Marie Leonhardt,* 320 F.2d 262, 266 (3d Cir.1963); *P. Dougherty Co. v. United States,* 207 F.2d 626, 630–632 (3d Cir.1953); *A.F.A. Tanker Corp. v. Reinauer Transportation Co.,* 594 F.Supp. 598, 608 (S.D.N.Y.1984); *Tempest* at 62. During the VHF communication, Mate Frankowski never informed the M/T Faith I of the unwritten request of the pilot station or that he intended to continue navigating the Independence/Ocean 192 down the eastern side of the Delaware Bay. It was reasonable for the M/T Faith I to assume that the Independence/Ocean 192 would move closer to Buoy number 5, in accordance with the requirements of good seamanship and prudent navigation, especially since both vessels rejected requests to pass each other close to Buoy number 6. Moreover, Second Mate Jacob never stated that the M/T Faith I would take any other action besides stopping its engines. Since the collision would not have occurred if the Independence/Ocean 192 had navigated towards the western side of the Delaware Bay close to Buoy 5, the court holds that the Independence/Ocean 192's violation of Rule 2 was a contributing cause of the collision.

### iii) Collision Avoidance Rules

Rule 7 and Rule 8 also apply to this case. Rule 7 (Risk of collision) states:

(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

(b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

(c) Assumptions shall not be made on the basis of scanty information, especially scanty radar information.

(d) In determining if risk of collision exists the following considerations shall be among those taken into account:

(i) Such risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change;

(ii) Such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

Rule 8 (Action to avoid collision) states in part:

(a) Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship. . . .

(e) If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all away off by stopping or reversing her means of propulsion.

(f)(i) A vessel, which by any of these rules, is required not to impede the passage or safe passage of another vessel shall, when required by the circumstances of the case, take early action to allow sufficient sea room for the safe passage of the other vessel.

(f)(ii) A vessel required not to impede the passage or safe passage of another vessel is not relieved of this obligation if approaching the other vessel so as to involve risk of collision and shall, when

taking action, have full regard to the action which may be required by the rules of this part.

(f)(iii) A vessel the passage of which is not to be impeded remains fully obliged to comply with the rules of this part when the two vessels are approaching one another so as to involve risk of collision.

■ Both vessels violated Rule 7 by failing to take compass bearings or radar plots of the other vessel to determine the speed and the changes in the speed of the other vessel. *See Potomac Transport* at 45–46; *Complaint of G & G Shipping Co., Ltd. of Anguilla*, 767 F.Supp. 398, 407, 409 (D.P.R. 1991); *Arabian American Oil Co. v. Hellenic Lines, Ltd.*, 633 F.Supp. 659 (S.D.N.Y.1986); *Williamson Leasing* at 1340; *Afran Transport* at 638. If compass bearings and radar plots would have been taken, the M/T Faith I would have realized that the Independence/Ocean 192 was heading down the eastern extreme of the Delaware Bay at a speed of approximately 12 knots close to Buoy number 6 and the Independence/Ocean 192 would have realized that the M/T Faith I's was not slowing down enough to avoid collision.

■ The M/T Faith I and the Independence/Ocean 192 also violated Rule 8. *See LoVuolo* at 26; *Oskar Tiedemann* at 241; *G & G Shipping Co.* at 409–410; *Williamson Leasing* at 1341; *Afran Transport* at 638. Both vessels should have realized by the use of radar that the course of the other vessel was not changing. However, the M/T Faith I did not take positive action in ample time to avoid the collision since it waited until about a minute before the collision to go full astern and to turn its rudder hard to starboard. The Independence/Ocean 192 also failed to take positive action in time since it continued navigating on automatic pilot at a speed of about 12 knots until about a minute before collision when it was switched to hand steering and the rudder was turned hard to starboard. Although a crossing situation existed in which it was the stand-on vessel, the Independence/Ocean 192 still had an obligation under Rule 8(f)(iii) to avoid a collision.[6] The violations of Rule 7 and Rule 8 were proximate causes of the collision.

*iv) Look–Out Rule*

■ Rule 5 (Look-out) states that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." A Rule 5 violation does not occur when those aboard a vessel have an unobstructed view of an approaching vessel even though no bow look-out is posted. *See Pacific–Atlantic* at 637–638; *The Mamei*, 152 F.2d 924, 929 (3rd Cir.1945); *Slobodna Plovidba v. King*, 688 F.Supp. 1226, 1236–1237 (W.D.Mich.1988); *Corporacion Insular de Seguros v. United States*, 646 F.Supp. 1230, 1234 (D.P.R.1986); *Makin* at 1175; *Complaint of Seiriki Kisen Kaisha*, 629 F.Supp. 1374, 1379–1381 (S.D.N.Y.1986); *Ta Chi Navigation* at 152–153.

■ Neither of the vessels violated Rule 5. Since visibility was good, Captain Misra and Second Mate Jacob aboard the M/T Faith I and Able Seaman Hopkins aboard the Independence had a clear view of the approaching vessels as a close-quarters situation was developing and there is no indication that they did not perform their duties as look-outs. Although no bow look-outs were posted, the court concludes that the posting of such look-outs would not have provided more information to either of the vessels.[7]

---

**6.** Moreover, both vessels also violated Rule 2 by not communicating with each other for at least six minutes before the collision even though a close-quarters situation was developing. *G & G Shipping Co.* at 411.

**7.** The court also concludes that both vessels were seaworthy since all crew members were competent and neither vessel was undermanned. *Petition of Kinsman Transit Co.*, 338 F.2d 708, 715 (2d Cir.1964); *La Normandie*, 58 F. 427, 430 (2d Cir.1893); *Matter of Oil Spill By the Amoco Cadiz*, 954 F.2d 1279, 1300 (7th Cir. 1992); *Complaint of Potomac Transport Inc.*, 741 F.Supp. 395, 409 (S.D.N.Y.1989).

### v) Safe Speed Rule

Rule 6 states in relevant part: Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions. In determining a safe speed the following factors shall be among those taken into account.... (b)(v) the number, location and movement of vessels detected by radar.

"The question of what is a proper rate of speed is relative to the situation of the ship." *Duet v. Delta Marine Drilling Co.,* 215 F.Supp. 898, 900 (E.D.La.1963); *See Lyon v. Ranger III,* 858 F.2d 22, 28–29 (1st Cir.1988); *Complaint of Cameron Boat Rentals, Inc.,* 683 F.Supp. 577, 583 (W.D.La.1988); *Bernert Towboat Co. v. USS Chandler (DDG 996),* 666 F.Supp. 1454, 1458 (D.Or.1987); *Alamia v. Chevron Transportation Corp.,* 660 F.Supp. 1123, 1127–1128 (S.D.Miss.1987).

Both vessels violated Rule 6. The M/T Faith I did not go full astern early enough and the Independence/Ocean 192 was going too fast at a speed of 12 knots to avoid a collision. In addition, both vessels should have slowed down since they were navigating in a Precautionary Area. The violation of Rule 6 was a proximate cause of the collision.

### vi) Manoeuvring and Warning Signals Rule

The relevant part of Rule 34 (Manoeuvring and warning signals) states:

(a) When vessels are in sight of one another ... a vessel ... shall indicate the manoeuvre by the following signals on her whistle: One short blast to mean "I am altering my course to starboard"; Two short blasts to mean "I am altering my course to port"; Three short blasts to mean "I am operating astern propulsion".....

(d) When vessels in sight of one another are approaching each other and from any cause either vessel fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle.

If signalling an alteration in course or an astern propulsion would not have served any useful purpose, the failure to signal, although a statutory violation, is not a contributing cause of the collision. *United Overseas Export Lines, Inc. v. Medluck Compania Maviera,* 785 F.2d 1320, 1325 (5th Cir.1986); *In re O.L. Schmidt Barge Lines, Inc.,* 475 F.2d 428, 431–432 (7th Cir. 1973); *Pacific–Atlantic* at 639. However, if a timely warning signal would have avoided the collision, the failure to give a warning signal is a contributing cause of the collision. *Henry Du Bois Sons Co. v. A/S Ivarans Rederi,* 116 F.2d 492, 494 (2d Cir.1940); *Barge Poling Bros.* at 1322; *Bucolo, Inc. v. S/V Jaguar,* 304 F.Supp. 1403, 1406 (D.Mass.1969); *Canal Barge Co. v. S/S Nancy Lykes,* 285 F.Supp. 135, 142 (E.D.La.1968).

Both vessels violated Rule 34. The M/T Faith I failed to signal its astern propulsion or its turn to starboard. Similarly, the Independence/Ocean 192 failed to signal its turn to starboard. However, the failure to give the appropriate signals for these actions did not contribute to the collision since the vessels were already in an *in extremis* situation when these actions to avoid a collision were taken, about a minute before the collision. Whistle signals at that time would have served no useful purpose in avoiding a collision.

In addition, neither of the vessels gave a timely warning signal, five short and rapid blasts on the whistle, when it was unclear whether the other vessel was taking sufficient action to avoid a collision. This violation of the Rule 34 did contribute to the collision. By the use of radar, the M/T Faith I should have realized that the Independence/Ocean 192 was continuing on its course close to Buoy number 6 on the eastern side of the Delaware Bay. Similarly, the Independence/Ocean 192 should have realized by the use of radar that the M/T Faith I's course was not changing. How-

ever, neither of the vessels gave a warning signal after the VHF communication.

### B) Allocation of Liability

 In allocating liability, the court must comply with the Supreme Court's pronouncement in *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975):

> We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

*Id.* at 411, 95 S.Ct. at 1715. *See Complaint of J.E. Brenneman Co.*, 782 F.Supp. 1021, 1025 (E.D.Pa.1992). Under this standard, it is relative culpability, not the degree of physical causation, on which liability is apportioned. *Cumberland County Utilities Authority v. M/T Delbar*, 604 F.Supp. 383, 389 (D.N.J.1985).

The court holds that both vessels are equally at fault for the collision on August 19, 1990. They both contributed to the collision for failing to take compass bearings and radar plots of the other vessel, for failing to take positive action in ample time to avoid the collision, for failing to navigate at a safe speed and for failing to give a warning signal. In addition, the M/T Faith I failed to comply with the crossing rules and her duty as the give-way vessel and the Independence/Ocean 192 failed to navigate towards the western side of the Delaware Bay close to Buoy number 5.

### III. CONCLUSION

For the foregoing reasons, the court finds the plaintiff, Maritrans Operating Partners L.P. 50% at fault and the defendants, M/T Faith I, Wallem Ship Management Ltd., PLM Investment Management Inc., Transpetrol Maritime PTE Ltd. and Alice G. Faith Ltd. 50% at fault for the August 19, 1990 collision between the Independence/Ocean 192 and the M/T Faith I.