**Ioannis V. PATERAKIS, Georgios Pirovolakis, Medhat Aly Kotb, Maria Paterakis, Ekaterini Loyakis Paterakis, Aristides Paterakis, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 2:93cv159.**

United States District Court, E.D. Virginia, Norfolk Division.

April 28, 1994.

Charles F. Tucker, Vandeventer, Black, Meredith & Martin, Norfolk, VA, Stephen K. Carr, James H. Hohenstein, Haight, Gardner, Poor & Havens, New York City, for plaintiffs.

Michael A. Rhine, Asst. U.S. Atty., Norfolk, VA, David V. Hutchinson, Asst. Director, Peter F. Frost, Trial Atty., U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, for defendant.

*OPINION AND FINAL ORDER*

REBECCA BEACH SMITH, District Judge.

This admiralty action arises out of the collision between the Greek fishing vessel VASSILIOS I and the United States Navy's cruiser USS VIRGINIA on February 23, 1991, in the Straits of Andikithiron off the coast of Crete.

Plaintiffs are the owner and master of the fishing vessel, Ioannis Paterakis; crewmembers of the vessel, Georgios Pirovolakis and Medhat Aly Kotb; and the survivors of the

decedent crewmember Theodossis Paterakis, namely Ekaterini Paterakis, Maria Paterakis, and Aristides Paterakis. The case was tried by this court without a jury. Both parties have submitted post-trial memoranda, and the case is now ready for decision.

## BURDEN OF PROOF

As an admiralty action, this case is within the court's civil jurisdiction. 28 U.S.C. § 1333. Therefore, plaintiffs bear the burden of proof by a preponderance of the credible evidence. *See, e.g., Lilienthal's Tobacco v. United States,* 97 U.S. 237, 266, 24 L.Ed. 901 (1878). Thus, pursuant to Fed.R.Civ.P. 52(a), the court makes the following Findings of Fact and resulting Conclusions of Law based upon the preponderance of the evidence standard, and finds that plaintiffs have failed to meet their burden of proof in this case.

## FINDINGS OF FACT

1. F/V VASSILIOS I ("VASSILIOS") was a fishing vessel duly registered in the Port of Chania, Greece. The vessel's length was 14.75 meters, its maximum width was 5.20 meters, and its gross tonnage was 21.90 tons. VASSILIOS was purchased by plaintiff Ioannis Paterakis in 1988. It was equipped with a magnetic compass; depth meter; VHF radio; whistle; barometer; radar; and various lights, including port, starboard, and stern lights.

2. USS VIRGINIA ("VIRGINIA") was being operated as a warship in the defendant's service on February 23, 1991. VIRGINIA was commissioned as a U.S. Navy vessel in 1976. It is 585 feet in length, with a beam of approximately 63 feet, and it displaces 11,300 tons.

### A. *Fishing Expedition*

3. On February 22, 1991, the VASSILIOS departed Chania, Crete, en route to the Straits of Andikithiron to fish for swordfish. On board the fishing vessel were its master and owner, Ioannis Paterakis, and the crew, Georgios Pirovolakis, Theodossis Paterakis, and Medhat Aly Kotb.

4. The method used for swordfishing included the setting of a long fishing line with a number of hooks, floaters, and lamps attached. Small lamps were attached to this line at intervals of about 50–70 hooks. Each lamp pole was also fitted with a small metal triangle to serve as a radar reflector.

5. VASSILIOS was approximately four miles north of Gramvousa on the northwest corner of Crete when line-laying operations began. The line was then laid in a north-westerly direction. On the evening of February 22, 1991, VASSILIOS set approximately fourteen miles of line with 600 hooks attached. The vessel then waited approximately three hours before beginning to retrieve its line at around midnight.

6. While collecting the line and removing the swordfish from the hooks, the VASSILIOS was traveling in an easterly direction. When about two-thirds, or ten miles, of line had been retrieved, the crew discovered the line had been cut.

7. VASSILIOS immediately commenced a search for the line. The crew spotted a lamp pole to the north and proceeded in that direction. However, plaintiff Ioannis Paterakis discovered in a radio conversation with the master of another fishing vessel, the POSEIDON, that the lamp pole he had seen actually belonged to the POSEIDON.

8. Next, VASSILIOS turned to starboard in a southeasterly direction and continued to look for its line. A radar reflector was detected on what was thought to be the lost line.

### B. *Planned Port Visit*

9. On February 22 and 23, 1991, VIRGINIA, a nuclear powered guided-missile cruiser was en route, via the Straits of Andikithiron, to a port visit at Souda Bay, Crete, after having been at sea for over two months participating in Operation Desert Storm.

10. Moonset occurred at 0343 in the morning on February 23, 1991, so the night was dark; however, visibility was unrestricted.

11. All of VIRGINIA's essential propulsion equipment was fully functional. The AN/SPS–55 and AN/SPS–64 radars were

functional and in use.[1] All navigation lights on board VIRGINIA were illuminated, but otherwise, she was a darkened ship.

12. VIRGINIA's commanding officer was Captain Gary Voorheis. Captain Voorheis retired for the night at about 2330 hours on February 22, 1991.

13. The Officer of the Deck ("OOD") was Lieutenant Rodney Sgrignoli. He relieved the previous OOD at about 0245 hours on February 23, 1991. The OOD was responsible for the entire ship and functioned as the Commanding Officer's representative when the latter was not on the bridge. The OOD was responsible for course and speed changes, and for keeping track of all surface contacts.

14. The conning officer on watch, known as the Junior Officer of the Watch ("JOOW") was Ensign Gerry D. Hollis. The JOOW was actually responsible for taking visual bearings on all surface contacts and delivering commands to the helmsman for engine speeds and rudder orders received from the OOD.

15. The Junior Officer of the Deck ("JOOD") was Lieutenant, junior grade, Henry B. Edwards. The JOOD assisted the OOD by monitoring the ship's radar and plotting on a maneuvering board the course, speed, and CPA (Closest Point of Approach) of surface contacts. The JOOD worked to complement radar information being received and processed by the Combat Information Center (the "CIC").

C. *VIRGINIA Detects a Skunk*

16. At 0400 hours VIRGINIA's course was 052 degrees true and her speed was 15 knots. At 0402 her course was changed to 057 degrees true. At about the same time, the CIC detected a new radar contact and it was designated Skunk "L."[2] The contact was bearing 051 degrees true at a range of 23,500 yards or 11.25 nautical miles ("nm"). The contact was not visible at the time of radar detection.

17. At 0406 VIRGINIA's speed was increased to 18 knots. At this time VASSILIOS was retrieving its fishing line and discovering the line had been cut.

18. The crew of VIRGINIA used three methods to track the movement of surface radar contacts. The first was the dead reckoning tracer ("DRT"), a device that develops a real time true geographic plot of its own ship's movement through the water and allows its operator to plot the bearings and ranges of radar contacts from its own ship. The result is a real time true geographic plot of all vessels detected by the own ship's radar. The second method of plotting was the maneuvering board, a method of plotting radar contacts' positions from its own ship in polar coordinates and analyzing their relative movement and courses and speeds. The third method was called "scopehead plotting." For this method the radar operator used a grease pencil to mark the position of a radar return on the glass surface of the radar screen. By continually marking the contact's position on the glass, the operator can discern whether the contact is moving closer to or away from its own ship. VIRGINIA's crew used all three of these methods on February 23, 1991.[3]

19. Skunk "L"'s radar bearing and range were logged periodically after it was first detected. After the 0416 contact information was recorded, VIRGINIA's crew used maneuvering board techniques to analyze "L"'s course, speed, and CPA. VIRGINIA's Bridge and CIC maneuvering board solutions concurred that "L" was Dead in the Water ("DIW"), with no discernible course or speed, and the CPA was to occur at 0442 at a

---

1. Although a problem with the 64 radar caused it to show a relative, not a true, bearing, this problem did not affect the accuracy of the radar itself.

2. "Skunk" is the term used by U.S. Navy vessels to designate unknown surface contacts. Skunks are assigned alphabetical designations starting with "Skunk A" as the first unknown surface contact detected after midnight on a given date.

In this case, "Skunk L" was later determined to be VASSILIOS.

3. VIRGINIA was also equipped with a Combat Designation System ("CDS"). This system was used to track unknown surface contacts through the use of computers. However, on the night in question, the CDS was turned off for scheduled maintenance.

bearing of 335 degrees true and a range of 4000 yards (2 nm).

20. At approximately 0416, the OOD, Lt. Sgrignoli, made a report to the Commanding Officer, Captain Voorheis. Skunk "L" was included among three contacts reported at the time. The report was in accordance with Captain Voorheis's Standing Orders, which included a direction that the OOD was to report to him any surface contact with a CPA calculated at less than 10,000 yards.

21. Skunk "L" was reported as being DIW off the port bow at 16,000 yards displaying a single dim white light. This light may have been a sternlight. Skunk "L" was further reported as displaying steady left bearing drift both visually and on radar. Such drift indicates that the contact will pass clear to port. Lt. Sgrignoli stated his intention to maintain present course (057 degrees true; Northeast) and speed (18 knots) and to continue to observe closely the contacts with CPA's on both the port and starboard sides of VIRGINIA. The observed bearing drifts of all contacts correlated with maneuvering board solutions on the Bridge and in CIC and also correlated with the radar scopehead CPA being maintained by the JOOD on the port bridge radar repeater.

22. At 0426 Skunk "L" had a radar bearing of 045 degrees true at a range of 11,900 yards (5.9 nm). The DRT at that time showed "L" tracking Northeast at 5–6 knots. At 0428, "L" was logged at 043 degrees true at a range of 10,800 yards (5.4 nm). The DRT indicated a CPA of approximately 2000 yards (1 nm) on VIRGINIA's port beam (327 degrees true).

23. At 0433, Skunk "L" had a radar bearing of 038 degrees true at a range of 8,800 yards (4.4 nm). The DRT plot continued to show "L" on a generally northeasterly course

(045 degrees true) at 5–6 knots with the CPA opening slightly. If VASSILIOS continued on this course and speed there would have been no collision. This situation posed no problems for either vessel.

24. Meanwhile, Ensign Alton Hollis, the port lookout, was assigned to maintain a visual lookout for contacts. Ensign Hollis visually spotted Skunk "L" 20–30 minutes before the collision, and thereafter made observations of that contact every three to four minutes, from his position at the centerline gyrocompass pelorus.

### D. *VASSILIOS Turns To Starboard*

25. As noted above, after a discussion with the master of the POSEIDON, VASSILIOS made a starboard turn and began to travel in a southeasterly direction.

26. Prior to this turn, Ioannis Paterakis noticed a large radar contact roughly astern of VASSILIOS whose range he estimated to be about six miles. Paterakis never made any effort to sight that contact visually, with or without binoculars. He never looked at the contact again on his radar, which was right next to his position at the vessel's wheel, until moments before the collision. Just before the collision he looked at his radar and saw that a single contact essentially filled the entire radar screen.

27. There was conflicting testimony regarding the time at which VASSILIOS made the turn. The court finds the credible evidence to be that the turn was made at 0439 hours to a course of 158 degrees at a speed of nine knots.[4] This led to a target angle between the two ships of 055 degrees.[5]

28. At 0439, VIRGINIA's DRT (Dead Reckoning Tracer) trace shows a single mark on Skunk "L" bearing 033 degrees true at

---

4. In this regard, the court agrees with defendant's expert, Captain Eugene Hickey, finding him to be the credible witness on this point. Plaintiff's expert, Captain Norman Cockroft, testified that VASSILIOS turned at 0428. He then calculated that the target angle between the two ships would be 113 degrees. However, as testified to by Captain Hickey, and as found by this court, one critical line on Captain Cockroft's diagram was drawn too long to correspond to the scale he used. The actual target angle between the two ships, even if VASSILIOS had turned at 0428, which this court finds it did not, would have been 109 degrees, not 113 degrees.

5. A "target angle" indicates the own ship's relative bearing from a contact, so that if the bridge watch team of VIRGINIA were looking directly at a contact's bow, that contact's "target angle" would be 000. If VIRGINIA were looking at the contact's port beam, the contact's "target angle" would be 090.

6,500 yards (3.25 nm). When plotted on that graphic display this mark reflects a turn to starboard. In accordance with their standard procedure, VIRGINIA's CIC watch team waited for the next three minute mark to determine whether the 0439 mark was erroneous or if a starboard turn had actually occurred. Prior to the next three minute mark (0442) radar contact on Skunk "L" was lost in the sea return on the radar scope.

29. At about this same time, VIRGINIA's port lookout, Ensign Alton Hollis, saw a green light off VIRGINIA's port bow. He reported it to the bridge.

30. VIRGINIA's starboard lookout, Richards, heard the port lookout's report and walked over to the port side to see the light. He confirmed the sighting and returned to his station on the ship's starboard side, satisfied that it had already been reported.

31. Sometime after Skunk "L" was lost on VIRGINIA's radar, the JOOW, Lt. Edwards, sighted a green starboard running light which he estimated to be 1,500 yards off VIRGINIA's port bow.

### E. *The Ships Collide*

32. Minutes before the collision, Lt. Thomas Foley, the Subsurface Warfare Coordinator ("SSWC"), came onto the Bridge from his watch station in CIC for a break. He sighted a green sidelight close aboard on VIRGINIA's port side. He warned the bridge watch team that "the contact is closer than you think it is." The OOD was near the bridge's starboard AN/SPA–25 radar repeater when that comment was made. The OOD then moved to the port side of the pilothouse and watched Skunk "L" closely. It appeared to him that Skunk "L" was converging on the VIRGINIA almost as if making an approach.

33. At 0448, the OOD ordered the Conning Officer to slow from 18 knots to 10 knots. The Conning Officer correctly ordered the speed change. The OOD noted a pit log reading of 12–13 knots, as Skunk "L" disappeared beneath VIRGINIA's bow.

34. The OOD ordered the Boatswain's Mate of the Watch to sound six short blasts on the ship's whistle. He also ordered the Conning Officer to apply right full rudder.

Both orders were executed. Skunk "L" disappeared in the area of the port bow.

35. An additional six short blasts were sounded on the ship's whistle without an order from the OOD. VIRGINIA's Commanding Officer, Captain Voorheis, who had been asleep prior to that time, awoke and entered the bridge near the time of collision.

### F. *The Aftermath*

36. Initially, VIRGINIA's OOD, Commanding Officer, and Bridge team were uncertain as to whether a collision had occurred. Although Lt. Foley testified that he was certain a collision had occurred, he did not report that to the Commanding Officer or to any other member of VIRGINIA's bridge watch team until some time later, if at all.

37. The Commanding Officer ordered all engines stopped and rudders amidships. Captain Voorheis was concerned that there might be other small contacts close aboard and wanted to retire to a clear area to reconstruct events. He ordered that an officer be assigned to find a clear sector using the AN/KAS–1, an infrared device capable of identifying surface contacts in the immediate vicinity. Observation through the AN/KAS–1 failed to reveal any small surface contacts either ahead or astern of VIRGINIA. At approximately 0504, he then ordered the ship to proceed to the center of a clear sector at 20 knots.

38. Captain Voorheis ordered the Operations Officer to interview the lookouts to determine if a collision had occurred. Once he determined that there had likely been a collision, he immediately ordered VIRGINIA to reverse course. At 0520, sixteen minutes after clearing the area, VIRGINIA turned down the reciprocal of its prior track. VIRGINIA's Commanding Officer was uncertain of the location of the collision and was concerned about the possibility of either a damaged vessel or injured crew in the water. Therefore, he ordered VIRGINIA to proceed ahead slowly.

39. An intense search for Skunk "L" was conducted, but Skunk "L" could not be found. Thinking a near miss may have occurred, the search still continued.

40. At 0533, the Commanding Officer briefed the crew on the 1MC, a general public address system on board the ship. He also solicited extra eyes topside and stationed the Lifeboat and Recovery detail.

41. At 0623, a small object in the water was sighted and a survivor was soon spotted atop wreckage about two nautical miles away. As the VIRGINIA approached the wreckage, two additional survivors were sighted.

42. At 0649, VIRGINIA launched her utility boat and rescued the survivors. At approximately 0704, VIRGINIA's boat crew reported one survivor was injured and a fourth individual had been on board the vessel at the time of the collision.

43. At 0727, the three survivors were on board the VIRGINIA and the Utility Boat was then directed to continue the search for the fourth individual. At 0753, the body of the fourth individual (Theodossis Paterakis) was located in the vicinity of the wreckage. At approximately 0817 the body was retrieved.

44. It was determined that Skunk "L" had collided with VIRGINIA. Skunk "L" went under VIRGINIA's bow from port to starboard and was struck nearly amidship by VIRGINIA's stem. The vessel was cut into two major pieces with one dragging down the port side and the other passing down the starboard. The wreckage of VASSILIOS was determined to be a navigational hazard and Captain Voorheis was given permission by higher naval authorities to sink the remains. After the VIRGINIA sank the remains of the wreckage, at approximately 0936, VIRGINIA proceeded to port in Souda Bay at twenty knots.

45. The survivors of the VASSILIOS were treated by VIRGINIA's medical officer and a cause of death opinion was issued on the decedent. The cause of death was determined to be multiple massive chest and abdominal blunt trauma and penetrating trauma, indicating death was instantaneous.

46. The survivors and the decedent were turned over to Greek authorities shortly after VIRGINIA's arrival in Souda Bay, at 1313.

## CONCLUSIONS OF LAW

1. Pursuant to 28 U.S.C. § 1333, this court has jurisdiction over this admiralty and maritime action. The court has jurisdiction over the defendant United States under the Public Vessels Act, 46 U.S.C.App. §§ 781–790 (hereinafter "PVA"), incorporating the consistent provisions of the Suits in Admiralty Act, 46 U.S.C.App. §§ 741–752 (hereinafter "SIAA").

2. Prior to and at the time of the collision the International Regulations for Preventing Collisions at Sea (hereinafter "COLREGS") were applicable to the vessels.

3. Experts for plaintiffs and defendant agreed that, prior to VASSILIOS's turn to starboard there was no "situation" under the COLREGS because the vessels were too far apart to pose any threat to one another. This court agrees with that assessment of the vessels' relationship before the turn.

4. The court also agrees with the experts that if the target angle between two ships is less than or equal to 112.5 degrees, a crossing situation exists; while if the target angle is greater than 112.5 degrees, an overtaking situation exists.

5. VASSILIOS's turn to starboard created a crossing situation under the COLREGS where none had existed before. In that crossing situation, VASSILIOS was the "give-way" vessel, charged by Rule 16 of the COLREGS with the responsibility of maneuvering to avoid VIRGINIA. VIRGINIA was the "stand-on" vessel, obligated by Rule 17 of the COLREGS to maintain course and speed.[6]

---

6. VIRGINIA did maneuver in the last seconds before the collision by applying right full rudder and reducing its speed. However, Rule 17(a)(ii) of the COLREGS allows VIRGINIA, the "stand-on" vessel, to maneuver in an attempt to avoid collision when "it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with" the COLREGS. Since VASSILIOS did not maneuver, VIRGINIA had the right to do so. The fact that her maneuvers were unsuccessful in avoiding the collision do not create liability where none existed prior to the maneuvers.

6. The Court finds that the primary reason for VASSILIOS's failure to comply with Rule 16 was her failure to comply with Rule 5 of the COLREGS, which requires every vessel to maintain a proper lookout by sight and sound. A lookout's failure to notice a vessel until the vessel is close aboard his own raises a presumption of an incompetent lookout. *In re Complaint of G & G Shipping Co., Ltd. of Anguilla*, 767 F.Supp. 398, 406 (D.P.R.1991). In this case, however, the presumption is fortified by voluminous evidence. Experts for plaintiffs and defendant agreed that VASSILIOS did not comply with Rule 5. The evidence was undisputed that the night of the collision in this case was clear with visibility unobstructed. There was no difficulty in seeing other vessels' navigational lights. VIRGINIA's lookouts saw a green light on VASSILIOS approximately ten minutes prior to the collision.[7] Captain Paterakis did not see VIRGINIA's lights until after the collision. As Paterakis testified, after he detected a large vessel astern of him on his radar he never looked to see whether he could see the larger ship. He did not attempt to track the larger ship on the radar, maintained no plot, and did not look again at his radar until the instant of collision. Captain Paterakis did not maintain a proper lookout and so could not know that his vessel was entering a crossing situation with VIRGINIA. Conversely, through its use of radar and crewmembers, VIRGINIA kept a proper lookout at all relevant times.

7. Another cause of the collision in this case was VASSILIOS's failure to comply with Rule 7, which requires all vessels to assess risk of collision using all available means, including radar if installed. Compliance with the rule requires that a vessel equipped with radar use it properly. This requires plotting or equivalent systematic observation of radar contacts. Captain Paterakis neither plotted contacts with his radar nor systematically observed them. Again, he barely observed the radar at all. VASSILIOS did not comply with Rule 7 and her failure to comply contributed to Paterakis's being unaware of the development of a crossing situation in which his vessel was the "give-way" vessel. In contrast, the crew of VIRGINIA maintained no fewer than three different plots of their radar data, monitored at appropriate time intervals.

8. VIRGINIA's speed prior to the collision, 18 knots, was a safe speed in view of the prevailing circumstances in accordance with navigational rules. The area being transited was approximately seven miles wide and traffic was light. VIRGINIA was a highly maneuverable ship and had encountered only twelve vessels in four hours. VIRGINIA did not violate Rule 6 of the COLREGS (requiring a safe speed).

9. Although there are indications that errors were made in CIC relating to plotting, timeliness in developing solutions and utilization of all redundant sources of contact information, VIRGINIA's CIC performance did not contribute to the collision.

10. The actions of VIRGINIA's Commanding Officer in the search and rescue effort were prudent and proper. While one officer on VIRGINIA testified that he believed VIRGINIA had collided with the contact, he did not share this information with the Commanding Officer or with any other officer on the bridge until some time after the collision. The Commanding Officer, responsible for deciding what actions the ship should take, did not conclude that a collision was a real possibility until twenty to thirty minutes after the event, when the ship's lookouts had been interviewed. As soon as he came to that conclusion, he ordered the ship's speed slowed and reversed course to begin a search and rescue effort. "After a collision each vessel has the duty to stand by and render such assistance to the other as may be practicable and necessary." *Caradelis v. Refineria Panama, S.A.*, 384 F.2d 589, 592 (5th Cir.1967). VIRGINIA did render such assistance here, and thus did not violate the duty to stand by.

11. The causes of the collision in this case were the failures by VASSILIOS to comply with the COLREGS. VIRGINIA complied with the applicable rules. VIRGINIA's fail-

---

**7.** This coincides with the turn of the vessel to the south, as the starboard light on the VASSILIOS was green. This light would not have been visible from the VIRGINIA until after the turn.

ure to avoid the collision visited upon it by VASSILIOS does not constitute a violation of the rules and is not a basis for liability. VASSILIOS as the "give-way" vessel was solely responsible for the collision.

12. Based on the foregoing, the plaintiffs have failed to meet their burden of proof and the defendant bears no liability for any injuries or damages plaintiffs may have suffered.

Accordingly, the court DIRECTS the Clerk to enter judgment for the defendant in this case. The Clerk is also DIRECTED to send a copy of this opinion and final order to all counsel of record.

It is so ORDERED.