60 F.3d 824
NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Ioannis V. PATERAKIS; Georgios Pirovolakis; Medhat Aly
Kotb; Maria Paterakis; Ekaterini Loyakis
Paterakis; Aristides Paterakis,
Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 94-1778.
 United States Court of Appeals, Fourth Circuit.
 Argued April 3, 1995
Decided July 5, 1995
 
 ARGUED: Stephen K. Carr, Haight, Gardner, Poor & Havens, New York, NY, for Appellants. David Vernon Hutchinson, Assistant Director, Admiralty Section, Civil Division, United States Department of Justice, Washington, DC, for Appellee. ON BRIEF: James H. Hohenstein, Jason W. Gardner, Haight, Gardner, Poor & Havens, New York, NY; Charles F. Tucker, Sr., Vandeventer, Black, Meredith & Martin, Norfolk, VA, for Appellants. Frank W. Hunger, Assistant Attorney General, Peter F. Frost, Trial Attorney, Admiralty Section, Civil Division, United States Department of Justice, Washington, DC; Helen F. Fahey, United States Attorney, Michael Rhine, Assistant United States Attorney, Norfolk, VA, for Appellee.
 Before RUSSELL, WILKINS, and MICHAEL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 The crew of a Greek fishing boat (collectively "Paterakis") sued the United States after its vessel collided with a United States Navy cruiser off the coast of Crete. Following a bench trial the district court determined that the fishing vessel was solely responsible for the collision and entered judgment for the United States. Paterakis now appeals. Finding no error, we affirm.
 
 I.
 
 2
 The VASSILIOS was a Greek fishing vessel owned by Ioannis Paterakis. The VIRGINIA is a cruiser owned by the United States Navy. On the evening of February 22, 1991, the VASSILIOS and her crew of four were fishing for swordfish in the vicinity of the Straits of Andikithiron off the coast of Crete. At about midnight the crew began to retrieve its fishing line. After collecting part of the line, the crew discovered that the line had been cut and began to head north to search for the rest of the line.
 
 
 3
 At the same time, the VIRGINIA was returning to port following Operation Desert Storm. Her course was about 57 degrees true and her speed was 15 knots. The moon had set, so the night was dark. The VIRGINIA was equipped with two sets of radar. Several watchstanders monitored the radar and calculated radar contacts' courses and speeds.
 
 
 4
 At about 0402, the VIRGINIA's radar detected a new radar contact which was designated Skunk "L."[1] At 0406 the VIRGINIA increased her speed to 18 knots. At 0416 Skunk "L" was detected off of the port bow and on a course indicating that it would pass clear to port. Therefore, the VIRGINIA maintained its present course. Additional radar readings were taken on Skunk "L" at 0426, 0428, 0433, 0436, and 0439. These readings indicated no danger of collision. After 0439, the VIRGINIA lost radar contact on Skunk "L" in the sea return[2] on the radar scope.
 
 
 5
 At some point, the time of which is disputed, the VASSILIOS turned to starboard and began to head southeast, toward the path of the VIRGINIA. The turn was not detected by the VIRGINIA's radar. Prior to this turn, Ioannis Paterakis noticed a large radar contact roughly astern whose range he estimated to be about 6 miles. However, he never attempted to sight the contact visually and did not look again at his radar until moments before the collision.
 
 
 6
 Shortly after VIRGINIA's radar lost Skunk "L", several members of VIRGINIA's lookout noticed a green light[3] off VIRGINIA's port bow. They reported the sighting to the bridge. Minutes before the collision, Lt. Foley, who was on the bridge, sighted a green sidelight close to VIRGINIA's port side. He warned the bridge watch team that the "contact is closer than you think it is." The officer on deck noticed that the green light seemed to be converging on the VIRGINIA. At 0448, the officer on deck ordered VIRGINIA to slow from 18 knots to 10 knots and sounded 6 short blasts on the ship's whistle. He also ordered the conning officer to apply right full rudder. Skunk "L" disappeared beneath VIRGINIA's bow.
 
 
 7
 The VIRGINIA's commanding officer, Captain Voorheis, then awoke and entered the bridge. Initially Voorheis and the bridge team were uncertain as to whether a collision had occurred, although Lt. Foley testified that he was certain that it had. At 0504 Voorheis ordered the VIRGINIA to retire to a clear sector at 20 knots to reconstruct events. Sixteen minutes later, Voorheis determined that a collision probably had occurred and began to return slowly to the site of the accident to search for victims. At 0623, the crew spotted survivors floating atop wreckage about two miles away. The VIRGINIA rescued the first of the survivors at 0649, and two more survivors by 0727. At 0753, the VIRGINIA found the body of the last crew member of the VASSILIOS, who had been killed in the collision.
 
 
 8
 Ioannis Paterakis, the other surviving members of the VASSILIOS's crew, and the decedent's family sued, alleging (1) the VIRGINIA was liable for the collision, and (2) the VIRGINIA's failure to rescue the crew immediately caused them suffering and distress by forcing them to spend two hours in the icy waters. Following a bench trial, the district court found that the VASSILIOS was required to give way and failed to do so, and that the VIRGINIA did not violate any applicable regulations. Therefore, it held the VASSILIOS solely at fault for the collision. It also found that the VIRGINIA's actions following the collision were reasonable. The district court entered judgment for the United States, and Paterakis appeals.
 
 II.
 
 9
 Paterakis challenges the district court's findings leading to the conclusion that the VASSILIOS was entirely at fault for the collision. In this admiralty case we apply ordinary standards of review, Hellenic Lines, Ltd. v. Prudential Lines, Inc., 813 F.2d 634, 638 (4th Cir.1987), and therefore review the district court's factual findings only for clear error, United States v. Daughtrey, 874 F.2d 213 (4th Cir.1989).
 
 A. Overtaking or crossing situation
 
 10
 Paterakis first challenges the district court's finding that the VASSILIOS was required to give way to the VIRGINIA. When two ships are on converging courses, their respective duties are determined according to the International Regulations for Preventing Collisions at Sea ("COLREGS"), 33 foll. U.S.C. Sec. 1602. Which vessel has the duty to give way depends on how the vessels are approaching each other. An "overtaking" situation exists when one vessel "com[es] up with another vessel from a direction more than 22.5 degrees abaft her beam." COLREGS, Rule 13. Technically, an overtaking situation exists when the "target angle"[4] between the two vessels is greater than 112.5 degrees. Otherwise, a "crossing" situation exists.[5] When an overtaking situation exists, the vessel approaching from behind must give way to the forward vessel. COLREGS, Rule 13. In a crossing situation, the vessel which has the other on her starboard side must give way. COLREGS, Rule 15. The vessel that has the duty to yield is called the "give-way vessel," and the other the "stand-on vessel." The parties agree that the VIRGINIA and VASSILIOS were situated so that the VASSILIOS was the give-way vessel if a crossing situation existed, and the VIRGINIA was the give-way vessel if an overtaking situation existed. Therefore, a critical issue at trial was the target angle between the VIRGINIA and the VASSILIOS.
 
 
 11
 At trial, Paterakis' argument that an overtaking situation existed was based on the testimony of his expert witness, Captain Cockcroft. Cockcroft testified that the VASSILIOS turned to starboard at 0428, and that its path from the point of its turn to the point of collision would have created a target angle of 113 degrees, and thus an overtaking situation. The United States' expert, Captain Hickey, testified that the radar readings from the VIRGINIA showed that the VASSILIOS turned at 0439, and that the resulting target angle would have been 55 degrees, creating a crossing situation. Hickey's scenario would have required the VASSILIOS to have traveled at nine knots from the point of its turn to the collision site. Ioannis Paterakis, the captain of the VASSILIOS, testified that his vessel had a maximum speed of five or six knots.
 
 
 12
 The district court determined that a crossing situation existed, and that the VASSILIOS therefore had the duty to yield. Whether an over-taking situation exists is a factual issue that we review only for clear error. Newby v. F/V Kristen Gail, 937 F.2d 1439, 1441 (9th Cir.1991). We see no reason to disturb the district court's finding. The determination of the time the VASSILIOS turned simply involved a credibility judgment by the district court. The district court explicitly chose to believe Hickey, whose testimony was corroborated by the radar readings from the VIRGINIA, rather than Cockcroft. It explicitly discredited Paterakis' testimony regarding the maximum speed of the VASSILIOS. Furthermore, Captain Hickey testified, and the district court found, that even if the VASSILIOS turned at 0428, the resulting target angle would have been only 109 degrees, or just shy of the 112.5 degrees required for an overtaking situation. Accordingly, the district court did not err in finding that a crossing, rather than overtaking situation, existed and that the VASSILIOS therefore had the duty to give way to the VIRGINIA.
 
 B. Violations of COLREGS
 
 13
 The district court found that the VASSILIOS failed to give way to the VIRGINIA and failed to comply with several COLREGS, including Rule 5, which required it to maintain a proper lookout, and Rule 7, which required it to use all available means to avoid a collision. Paterakis does not appear to contest these findings, but rather argues that the VIRGINIA should be found partially at fault because it violated the following COLREGS: Rule 5 (proper lookout), Rule 6 (safe speed), Rule 7 (proper use of radar and other means of avoiding collision), Rules 8 and 17 (action by stand-on vessel to avoid a collision), Rule 34 (warning signals), and Rule 2 (precautions "required by the ordinary practice of seamen").
 
 
 14
 The district court found that the VIRGINIA did not violate any COLREGS. With regard to Rule 5, it found that the "VIRGINIA kept a proper lookout at all relevant times." Paterakis v. United States, 849 F.Supp. 1106, 1112 (E.D. Va.1994). Regarding Rule 6, it found that the VIRGINIA's speed of 18 knots was safe in view of the lightness of traffic and the VIRGINIA's high degree of maneuverability. Id. As to Rule 7, it determined that the VIRGINIA properly used its radar "at all relevant times," maintaining "no fewer than three different plots of their radar data." Id. Finally, with respect to Rules 8 and 17, it noted that the VIRGINIA took evasive action when it realized collision was imminent and that the VASSILIOS was not going to yield. Id. at 1111 n. 6. With respect to all of these Rules, we find no error and therefore affirm the district court on its own reasoning.
 
 
 15
 The district court did not explicitly address Rules 2 and 34. Rule 2 requires a vessel to take "any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." Paterakis claims that the VIRGINIA violated Rule 2 by failing to attempt to communicate with the VASSILIOS by VHF radio. This contention was not raised before the district court, and we therefore do not address it on appeal. Muth v. United States, 1 F.3d 246, 250 (4th Cir.1993).
 
 
 16
 Rule 34(d) requires the use of a warning signal:
 
 
 17
 [w]hen vessels in sight of one another are approaching each other and from any cause either vessel fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle.
 
 
 18
 The district court found that the VIRGINIA blew six whistle blasts just prior to the collision. Although it did not explicitly address whether that action satisfied Rule 34(d), it concluded generally that the VIRGINIA complied with all applicable rules.
 
 
 19
 The evidence supports the district court's conclusion that the VIRGINIA did not violate Rule 34(d). When the VIRGINIA's radar lost the VASSILIOS in sea return, the last reading showed a course that would result in a closest point of approach of about 1500 yards. At that point, no doubt existed about the VASSILIOS's intentions, and the VIRGINIA had no duty to signal. See Compania De Navegacion Cebaco, S.A. v. The Steel Flyer, 200 F.2d 643, 647-48 (4th Cir.1952) (no duty to blow whistle when no doubt about actions of other vessel); c.f. United States v. Soya Atlantic, 330 F.2d 732, 736 (4th Cir.1964) (duty to sound danger signal arose only when it became apparent that give-way vessel was not going to yield); Maritrans Operating Partners L.P. v. M/T Faith I, 800 F.Supp. 133, 143 (D.N.J.1992) (duty to sound whistle arose only when radar readings indicated collision would occur).
 
 
 20
 The district court found that the VIRGINIA first became aware that the VASSILIOS might be closer than expected just "minutes before the collision," when Lt. Foley noticed the VASSILIOS's green sidelight off of the VIRGINIA's port side. Shortly thereafter, the VIRGINIA reduced its speed, applied right full rudder, and blew six short blasts on the ship's whistle. Even if a short time lapsed between the moment of Foley's warning and the sounding of the whistle, the vessels were already in an in extremis situation, and we do not secondguess the VIRGINIA's last-minute actions to avoid the collision. Curtis Bay Towing Co. v. Sadowski, 247 F.2d 422, 424-25 (4th Cir.1957); see also Maritrans, 800 F.Supp. at 143 (failure to give whistle signal one minute before collision did not contribute to collision because vessels were already in an in extremis situation).
 
 
 21
 We therefore affirm the district court's finding that the VIRGINIA complied with the COLREGS.
 
 C. Duty to stand by
 
 22
 Finally, Paterakis argues that the district court erred in finding that the VIRGINIA properly undertook its duty to stand by and render aid and assistance after the collision occurred. A vessel involved in a collision must "stand by and render such assistance to the other as may be practicable and necessary." Caradelis v. Refineria Panama, S.A., 384 F.2d 589, 592 (5th Cir.1967); see Hunley v. Ace Maritime Corp., 927 F.2d 493 (9th Cir.1991).[6] Here, the district court found that the VIRGINIA, uncertain whether a collision had occurred, retired to a clear sector to reconstruct events. Sixteen minutes later, after determining that a collision had occurred, it returned to the site of the accident and began a rescue effort. All of the survivors of the accident were rescued within approximately two hours after the rescue was initiated.
 
 
 23
 We agree that the VIRGINIA complied with its duty to stand by. It was appropriate for Voorheis to insure his own vessel was secure before beginning the rescue effort. See Caradelis, 384 F.2d at 594; The Sidney M. Hauptman, 34 F.2d 622, 624 (2d Cir.1929). He returned as soon as safe and practicable and did not evince a purpose to run away. The Sidney M. Hauptman, 34 F.2d at 624. This is not a case in which one vessel entirely abandoned the other, e.g. Hunley, 927 F.2d 493; Theothilatos v. Martin Marine Transp. Co., 127 F.2d 1016 (4th Cir.1942); The Kenilworth, 64 F. 890 (D.N.Y. 1894), or began a rescue attempt only after an unreasonable delay, The Buenos Aires, 5 F.2d 425, 434-35 (2d Cir.1924) (three to four hour delay resulting in deaths of a number of the crew). We therefore affirm the district court's determination that the VIRGINIA rendered appropriate assistance.
 
 III.
 
 24
 For the foregoing reasons, we affirm the judgment of the district court.[7]
 
 AFFIRMED
 
 
 [1]
 "Skunk" is shorthand for "unknown surface contact."
 
 
 [2]
 "Sea return" is interference caused by the tops of the waves surrounding a vessel
 
 
 [3]
 The VASSILIOS displayed green and red lights on the starboard and port sides, respectively
 
 
 [4]
 When vessel A approaches vessel B from behind, the target angle is the angle between vessel B's direction of travel and the line of sight between vessel B and vessel A
 
 
 [5]
 The third possibility, a "head-on" situation, is not at issue here
 
 
 [6]
 This duty has been codified by the Stand By Act, which requires a vessel involved in a collision to
 render necessary assistance to each individual affected to save that affected individual from danger caused by the marine casualty, so far as the master or individual in charge can do so without serious danger to the master's or individual's vessel or to individuals on board.
 46 U.S.C. Sec. 2303(a)(1).
 
 
 [7]
 Because we find no statutory violation by the VIRGINIA, we need not address the affect of the rule of The Pennsylvania, 86 U.S. (19 Wall.) 125 (1874), on this case